MAR 24 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JUNCTION SOLUTIONS, LLC f/k/a )
JUNCTION MANAGEMENT SOLUTIONS, )
LLC, a Delaware limited liability company, )

        Plaintiff,

    v.

MBS DEV, INC., a Colorado Corporation, )
JEFFREY ERNEST, MITCH TUCKER, and )
KENNETH R. PAUL, )
    )
        Defendants. )

**06CV1632
JUDGE GOTTSCHALL
MAGISTRATE SCHENKIER**

### NOTICE OF REMOVAL

Defendants MBS DEV, Inc.; Jeffrey Ernest; Mitch Tucker; and Kenneth R. Paul, by and

through their undersigned counsel, hereby exercise their right to remove the above-captioned

action from the Circuit Court of Cook County, Illinois pursuant to 28 U.S.C. § 1441 *et seq.* In

support of their removal, Defendants state as follows:

1. The above-captioned action is currently pending as Civil Action No. 06 CH 05091 in the

Circuit Court of Cook County, Illinois, County Department, Chancery Division.

2. Plaintiff Junction Solutions, LLC purports to be a Delaware limited liability company

with a principal place of business in Lincolnshire, Illinois. Under 28 U.S.C. § 1332(c)(1),

Junction Solutions, LLC is considered to be a citizen of the States of Delaware and Illinois.

3. Defendant MBS DEV, Inc. is a Colorado corporation with its principal place of business

in Westminster, Colorado. Under 28 U.S.C. § 1332(c)(1), MBS DEV, Inc. is considered to be a

citizen of the State of Colorado. Defendants Jeffrey Ernest, Mitch Tucker, and Kenneth R. Paul

are also citizens of the State of Colorado.

4.      In its Complaint for Injunctive Relief and Damages, attached hereto as Exhibit A, Plaintiff Junction Solutions, LLC purports to seek an amount not less than $10,000,000, exclusive of interest and costs. *See* Ex. A, p. 16.

5.      Because the matter in controversy in this action exceeds $75,000, exclusive of interests and costs, and is between citizens of different States, the district court has original jurisdiction over this action under 28 U.S.C. § 1332(a) and removal is proper under 28 U.S.C. § 1441(a). Because none of the defendants is a citizen of the State of Illinois, 28 U.S.C. § 1441(b) does not prohibit removal of this action.

6.      Copies of all process, pleadings, and orders served upon the defendants in this action are attached hereto. Exhibit A is a true and correct copy of the Complaint for Injunctive Relief and Damages as served upon the defendants. Exhibit B is a true and correct copy of the summons served upon the defendants.

WHEREFORE, Defendants hereby remove the action pending as Civil Action No. 06 CH 05091 in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, to this Court.

Respectfully submitted,

Date: March 24, 2006

By: _____

Leif R. Sigmond, Jr.  (ID No. 6204980)
Joshua R. Rich (ID No. 6225923)
**McDonnell Boehnen Hulbert & Berghoff LLP**
300 South Wacker Drive
Chicago, Illinois 60606
Tel.: (312) 913-0001
Fax: (312) 913-0002

*Of counsel:*

Peter A. Gergely
Merchant & Gould
1050 Seventeenth Street, Suite 1950
Denver, Colorado 80265
Tel.: (303) 357-1670
Fax: (303) 357-1671

Matthew A. Doscotch
Merchant & Gould
80 South Eighth Street, Suite 3200
Minneapolis, Minnesota  55402
Tel.: (612) 371-5271
Fax: (612) 332-9081

# EXHIBIT A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| JUNCTION SOLUTIONS, LLC f/k/a | ) | |
| JUNCTION MANAGEMENT SOLUTIONS, | ) | |
| LLC, a Delaware Limited Liability Company, | ) | |
| | ) | JCH05091 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MBS DEV, Inc., a Colorado Corporation, | ) | **Jury Demanded** |
| JEFFREY ERNEST, MITCH TUCKER, and | ) | |
| KENNETH R. PAUL, Individuals, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, JUNCTION SOLUTIONS, LLC f/k/a JUNCTION MANAGEMENT

SOLUTIONS, LLC ("Junction"), by and through its attorneys, Synergy Law Group, LLC,

and for its Complaint against Defendants, MBS DEV, Inc. ("MBS"), JEFFREY ERNEST

("Ernest"), MITCH TUCKER ("Tucker"), and KENNETH R. PAUL ("Paul") (individual

defendants Ernest, Tucker and Paul collectively referred to herein as "Individual

Defendants'), states as follows:

#### *Nature of the Action*

1.     This is an action seeking preliminary and permanent injunctive relief,

monetary damages and other relief in connection with the wrongful conduct and actions

engaged in and undertaken by the various defendants.

2.     Junction is a business software services and information technology

consulting company engaged in the business of marketing, designing, creating, licensing

and selling business application software and providing implementation services and

support for its software.  The Junction-owned software applications include the Junction

Multi-Channel Distribution Software for Microsoft Axapta offering (referred to herein as the "Junction Multi-Channel Distribution Software"), the first of its kind developed for the Axapta Platform. Customers and prospective customers for the Junction Multi-Channel Distribution Software include retail catalog companies, internet-based merchants, and companies that target individual consumers rather than businesses.

3.      Axapta is a software application provided by Microsoft Corporation that contains basic business functionality that enables its customers to run general functions such as accounting, inventory management, and manufacturing. Microsoft Axapta (referred to herein as the "Axapta Platform") in its standard form cannot support the needs of customers needing multi-channel distribution capabilities without many man-years of additional software development.

4.      There are a very limited number of companies, including Junction, which have formed partnerships with Microsoft which allow them to develop applications using Axapta's proprietary technology tools and basic functionality as a platform for its products, and firms that do not have a license and confidentiality agreement with Microsoft are not permitted or authorized to develop software for the Axapta Platform. Junction commenced such a partnership with Microsoft several years ago and has been developing in Axapta since that time.

5.      The Junction Multi-Channel Distribution Software developed for the Axapta Platform is very valuable intellectual property because it enables a firm, like Junction, engaged in the business software and information technology services business to sell not only the industry focused software such as the Junction Multi-Channel Distribution Software, but also the Axapta software itself and the implementation services, to customers that would not otherwise purchase the Axapta software if the industry focused software did

2

not exist. The total value of such a sale ranges from $500,000.00 to over $2,000,000.00 per customer.

6.    MBS is also engaged in the business software services and information technology consulting industry.

7.    The Individual Defendants are former employees of Junction and, on information and belief, are currently employees of MBS and have been since terminating their employment with Junction.

8.    On or about January 16, 2004, each of the Individual Defendants executed an identical confidentiality agreement entitled "Junction Management Solutions, LLC – Confidentiality Agreement" (the "Confidentiality Agreement") with Junction, pledging to guard and protect Junction's trade secrets and confidential information from disclosure to any third party. Copies of each defendant's Confidentiality Agreement are attached hereto as Exhibits A through C.

9.    On July 1, 2004, the Individual Defendants each executed an identical, formal employment agreement, also containing a confidentiality provision (the "Employment Agreement"). Copies of each defendant's Employment Agreement are attached hereto as Exhibits D through F.

10.    The Individual Defendants worked for Junction (subject to contractual obligations to Junction in the Confidentiality Agreement and Employment Agreement) to use, apply and develop Junction's confidential and trade secret information in connection with the development of Junction's innovative Junction Multi-Channel Distribution Software.

11.    Once the Junction Multi-Channel Distribution Software was created, the Individual Defendants abruptly ended their employment with Junction and went to work

3

for MBS. On information and belief, the Individual Defendants also have an ownership or financial interest in MBS.

12. On information and belief, MBS is publicly marketing a multi-channel distribution software product for the Axapta Platform that is claimed to be, in essence, identical to the one the Individual Defendants developed while employed by Junction.

13. On information and belief, Defendants have wrongfully collaborated for the application and use of Junction's confidential information, trade secrets, and intellectual property in the Business of MBS.

14. On information and belief, since before the Individual Defendants' departure from Junction, MBS and the Individual Defendants were intent on taking and using Junction's confidential and trade secret information without permission and in contravention of contractual obligations to Junction in order to launch a multi-channel distribution software for the Axapta Platform.

15. The various claims asserted herein include breach of the employment and confidentiality agreements; misappropriation of trade secrets in violation of the Illinois Trade Secrets Act; tortious interference with contracts and prospective business advantage, and a claim for preliminary and permanent injunctive relief.

### Parties

16. Junction is a Delaware limited liability company founded in 2001 with its principal place of business located Lincolnshire, Illinois. The founders of Junction are Brian Carpizo, Jeff Grell and Chris Hafenscher.

17. MBS is a Colorado corporation, incorporated on or before June 10, 2004. On information and belief, MBS was founded by Steve Guillaume ("Guillaume"), while he was an officer and employee of Junction, and his wife, Laura Guillaume, while she was a

4

contractor for Junction.  MBS was founded by Guillaume and Laura Guillaume without Junction's knowledge or consent.

18.     On information and belief, each of the Individual Defendants are a resident of Colorado, and are currently an employee and equity owner of and/or has a financial interest in MBS.

### Jurisdiction and Venue

19.     Venue and jurisdiction are proper in this forum because the Illinois Trade Secrets Act gives Illinois Courts jurisdiction over Junction's trade secrets claim. Additionally, venue and jurisdiction are proper because the Confidentiality Agreements and Employment Agreements both provide that any action brought to enforce the terms of the Agreement shall be brought in the courts of Cook County, Illinois and determined by Illinois law.

20.     Further, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district, or a substantial part of the property that is the subject of the action is situated in this district.

### Common Factual Allegations

21.     Junction is a certified Microsoft Business Solutions Partner and authorized reseller, software developer and support provider for the Axapta Platform.   As an authorized reseller, Junction is authorized to sell licenses to its customers for use of the Microsoft Axapta software.

22.     Since Junction's inception it has spent a substantial amount of time and money developing, acquiring and utilizing confidential, proprietary and trade secret information relating to its industry, and specifically in the area of extension of the Axapta Platform for use by multi-channel retailers.

5

23.     Such confidential, proprietary and trade secret information includes, but is not limited to, techniques, processes, methodologies, and other know-how for specific application in Axapta-based software programs for multi-channel distribution, including, without limitation, as to computer source code, design, concepts, functionality, features, processes, enhancements, performance, innovations, architecture, specifications, code strings, code segments, routines and sub-routines, and market requirements.   Such confidential, proprietary and trade secret information also includes certain computer codes, architecture and other innovations and developments that build on and operate with Microsoft's Axapta Platform, such as those embodied in versions of the Junction Multi-Channel Distribution Software.   (All such confidential, proprietary and trade secret information are generally referred to herein as the "Junction Developments".)

24.     The Junction Multi-Channel Distribution Software, is a software application arising from application and use of the Junction Developments, which Junction developed for the Axapta Platform and which allows distributors of products who use different *retail* channels—websites, catalogs, and stores, for example (i.e. *multi-channel retailers*) — to manage all operational aspects of their business such as planning, marketing, selling, purchasing, storing, shipping, and accounting for the sales of their products.

25.     The Junction Developments and the Junction Multi-Channel Distribution Software have given Junction a competitive advantage in the industry, because, among other things, Junction has been able to define and meet the technical and field-specific needs of the small segment of the market that consists of *multi-channel retailers*.

26.     Junction began contemplating the development of the Junction Multi-Channel Distribution Software Module and other Junction Developments in December, 2003.  As part of this initiative, Junction hired Guillaume in January, 2004 to develop and

refine the Junction Developments and products. Prior to Guillaume becoming an officer and employee of Junction, Guillaume was not familiar with developing software for the Axapta Platform and had not programmed in the Axapta development language known as X++. Guillaume received all of his training, knowledge, and expertise in X++ and the Axapta development tools from Junction.

27.     To further its initiative to develop and license the Junction Developments, Junction hired three software developers, the Individual Defendants, to work under Guillaume to develop and refine the Junction Multi-Channel Distribution Software (and to use and develop Junction Developments) for operation with the Axapta Platform. Prior to Individual Defendants working for Junction, they were not familiar with developing software for the Axapta Platform and had not programmed in the Axapta development language known as X++. The Individual Defendants received all of their training, knowledge, and expertise in X++ and the Axapta development tools from Junction.

28.     Guillaume and the Individual Defendants spent eight months, pursuant to their written agreements with Junction, working primarily on applying and further developing the Junction Developments and the Junction Multi-Channel Distribution Software offering.

29.     Pursuant to the terms of the Confidentiality Agreement, each of the Individual Defendants made a covenant not to use, disclose, divulge, render or offer for his own benefit or for the benefit of any other person, firm, corporation or entity any confidential or trade secret information of Junction. (See Exhibits A through C, Section 3.2 (A) Confidentiality Covenants).

30.     The Confidentiality Agreement also provides that should the Individual Defendant violate any term or covenant of the Agreement, Junction may seek specific and

7

immediate legal and equitable relief, including seeking an immediate, temporary restraining Order without notice and without bond. The Confidentiality Agreement further provided that in the event any proceedings are required by Junction against the Individual Defendant for violations of any provision contained under the Confidentiality Agreement, Junction is entitled to recover its costs and expenses, including reasonable attorneys' fees, incurred in initiating and maintaining such proceeding. (See Exhibits A through C, Section 7, Equitable Relief.)

31.     The Confidentiality Agreement also provided that the construction and enforcement of the Agreement shall be governed by the internal laws of the State of Illinois. (See Exhibits A through C, Section 10, Interpretation.)

32.     Further, in July, 2004, when the Individual Defendants became employees of Junction, the Individual Defendants each signed an Employment Agreement in which each Individual Defendant agreed to "forever hold in confidence, and not use or disclose, all proprietary information, trade secrets, and confidential business and technical information" that each such person would acquire during his employment, including "business plans, methodologies, technologies (including computer software), [and] intellectual property...".

33.     At all relevant times, each Individual Defendant has been aware, pursuant to the Confidentiality Agreement and Employment Agreement, that the Junction Developments he has used, applied or developed are solely the intellectual property of Junction.

**Formation of MBS and the Individual Defendants' Departure from Junction**

34.     In August, 2004 Guillaume requested a separation from Junction, but continued to work as Junction's employee.

8

35.     Junction and Guillaume began negotiating for a separation that would have allowed Guillaume to form his own firm, with certain restrictions and provisions designed to affirm Junction's ownership of and to protect the confidentiality of the Junction Developments, and would have allowed such firm to become a contractor for Junction.

36.     Despite lengthy negotiations, that process never resulted in an agreement because Guillaume abruptly resigned without cause from Junction in September, 2004, and he continued work (unbeknownst to Junction) for his own firm, MBS. In September, 2004, the Individual Defendants failed to report for employment and subsequently ended their employment with Junction, stating that they were "transferring" to MBS.

37.     Junction became aware that Guillaume and his wife Laura had formed MBS several months prior to Guillaume terminating his employment with Junction and had commenced soliciting Junction's customers and employees (including the Individual Defendants) as early as June, 2004, while Guillaume was still an officer and employee of Junction and while Laura was employed as a contractor for Junction.

38.     Junction also became aware that during the four week period prior to the resignation of the Individual Defendants and Guillaume, and while they were under the employ of Junction, one or more of the Individual Defendants and Guillaume had been making new unauthorized, renamed copies of *all* of Junction's software code which was part of the Junction Developments and secretly saving the copies for themselves and/or MBS to a Junction server located in Guillaume's home in Colorado. Unknown to and unauthorized by Junction, these new files (numbering in the thousands) were all renamed with the prefix "MBS" in their names, changed from "JS" for Junction Solutions (the prefix denotes ownership of the code). When Junction demanded and retrieved the server from Guillaume after he quit his employment, Junction discovered that these new files had

9

been backed up to an unknown location and then deleted by MBS or its agents or principals from the server within hours of Junction's recovery of the server. The files were later recovered by Junction with the aid of a computer forensics consultant.

39.     Junction also discovered from the forensics consultant that other new, undisclosed developments related to the Junction Multi-Channel Distribution Software were deleted from the same server. These new developments were required to be disclosed to Junction pursuant to the Guillaume employment agreement, but were not.

40.     These and other events led to Junction's filing of a lawsuit against MBS and Steve and Laura Guillaume in federal court in Colorado.

41.     That case was eventually settled, with the Individual Defendants expressly reaffirming their confidential obligations under the Confidentiality Agreement and the Employment Agreement. The settlement did not address the activities of Defendants that are complained of in this action, which on information and belief occurred after the time of the settlement agreement.

**Events Leading up to This Complaint**

42.     On or about February 9, 2006, Junction obtained information that MBS was about to announce that they were partnering with a California company called Iteration2 to deliver the MBS multi-channel distribution software for the Axapta Platform.

43.     On February 17, 2006, Iteration2 issued a press release announcing that it had partnered with MBS to market the MBS multi-channel distribution software for the Axapta Platform for customers with multi-channel distribution requirements. The press release, attached hereto as Exhibit G, quotes MBS as stating, "We are excited about our partnership with Iteration2 to extend this offering to the Multi-Channel Distribution

10

companies." The press release also states that Iteration2 is developing a series of webcasts entitled "Taking Advantage of Multi-Channel Industry Solutions".

44.     Through their websites, marketing materials and other activities, together MBS and Iteration2 are now selling and promoting for use with the Axapta Platform a multi-channel distribution software which (i) MBS claims to have developed and to be capable of providing; (ii) MBS claims has the same functionality and industry user profile as that of the Junction Multi-Channel Distribution Software; and (iii) was developed using the developers (inclusive of the Individual Defendants) that were entrusted with the Junction Developments under contractual obligations prohibiting use or disclosure, and MBS knew of these contractual obligations.     Indeed, MBS and Iteration2 are now marketing this software product and related services with the claim that MBS is the "pioneer" of multi-channel distribution software for the Axapta Platform.

45.     Defendants could not possibly have developed such a software product, within the same narrow *multi-channel retail* market segment as Junction, for MBS without using and disclosing the Junction Developments, which were accessed by and entrusted with the Individual Defendants while employed by Junction and which they contractually committed to not use or disclose.

46.     Although Junction acknowledges the Individual Defendants' right to work for other companies, including MBS, Junction has never sanctioned or otherwise permitted the Defendants' use of Junction Developments for purposes of applying them to develop multi-channel distribution software for the Axapta Platform.

11

## Count I
## Permanent Injunction
### *(All Defendants)*

47. Junction realleges and incorporates by reference each of the allegations contained in paragraphs 1-46 as if fully stated herein.

48. The Junction Developments, including, without limitation, those embodied in the Junction Multi-Channel Distribution Software, constitute confidential information and trade secrets which the Individual Defendants were and are prohibited from using, maintaining, modifying, selling or otherwise possessing for their own benefit or the benefit of any other individual or entity, under the covenants of both the Confidentiality Agreements and the Employment Agreements.

49. Through the development and licensing of a multi-channel distribution software for MBS, the Individual Defendants have, at the very least, inevitably, and on information and belief, intentionally, used and disclosed and will continue to use and disclose Junction's trade secrets and confidential information, not only for use by MBS, but also for use by Iteration2 and all of the customers and third parties who may license or distribute such software.

50. MBS and the Individual Defendants' use of this confidential and trade secret information has caused, and will continue to cause, immediate, permanent, and irreparable injury to Junction's trade secrets and confidential information (including the Junction Developments), business, and competitive business advantage.

51. MBS and the Individual Defendants' use of this confidential and trade secret information is also damaging Junction by causing it to lose current and future customers and customer goodwill, and is creating confusion in the marketplace as to the origin and ownership of the Junction Developments.

12

52.     There is no adequate remedy at law for the injuries Junction has suffered and continues to suffer as a result of the Defendants' actions, and money damages would be insufficient to make Junction whole.

53.     Based on this immediate and irreparable injury to Junction, Junction is entitled to the entry of an Order immediately and permanently enjoining any and all of the Defendants from developing, using, selling, maintaining, licensing, distributing, copying, publishing, disclosing, and/or marketing the multi-channel distribution software developed or offered by any of the Defendants, and any and all other Junction confidential and trade secret information, to any other individual or entity, for any use whatsoever.

WHEREFORE, Plaintiff, JUNCTION SOLUTIONS, LLC respectfully requests that this Honorable Court enter an Order preliminarily and permanently enjoining 1) Defendants, MBS, ERNEST, TUCKER, and PAUL, from developing, using, selling, maintaining, licensing, copying, publishing, disclosing, altering, modifying or otherwise benefiting from their wrongful use and/or possession of any and all Junction confidential and trade secret information and material as described herein, including but not limited to the Junction Developments; 2) each of the Individual Defendants from developing or working as part of a team to develop a multi-channel distribution software for use with or as an extension of the Axapta Platform; 3) MBS from developing, using, selling, maintaining, licensing, distributing, copying, publishing, disclosing, marketing, or otherwise benefiting from the multi-channel distribution software developed wholly or in part by any of the Defendants and/or Guillaume; and grant it such further relief as the Court deems just and appropriate.

13

**Count II**
**Misappropriation of Trade Secrets- Violation of Illinois Trade Secrets Act**
**765 ILCS 1065 et seq.**
*(Against all Defendants)*

54.     Junction realleges and incorporates by reference each of the allegations contained in paragraphs 1-46 as if fully stated herein.

55.     The Illinois Trade Secrets Act, 765 ILCS 10652(d) *et seq.*, prohibits the misappropriation of trade secrets. 765 ILCS 1065/2 defines trade secrets as:

> Trade secret means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

56.     Junction's confidential trade secret information includes but is not limited to: the Junction Developments, the Junction Multi-Channel Distribution Software, along with all other similar proprietary information of Junction not in the public domain.

57.     At all times relevant herein, Junction has taken and continues to take all reasonable efforts to maintain the confidentiality of its business and trade secret information and closely guards such information from public disclosure.

58.     As a result of Junction's efforts, its trade secrets and confidential information is not generally known in Junction's industry. For this reason, Junction's trade secrets and confidential information are a source of great value for Junction.

59.     On information and belief, Defendants have used and disclosed, and will continue to use and disclose Junction's trade secrets and confidential information, despite having a contractual obligation to maintain the secrecy of and not to use such items. By

virtue of the intentional and wrongful conduct described above, Defendants have misappropriated Junction's confidential, proprietary and trade secret information.

60.     In developing, marketing or otherwise dealing in a multi-channel distribution software program for the Axapta Platform for MBS, Iteration2 and others, Defendants have and will continue to inevitably use or disclose Junction's trade secrets and confidential information.

61.     Defendants have willfully and wrongfully used, marketed, profited from and disclosed Junction's confidential, proprietary and trade secret information to injure, harm and otherwise cause irreparable injury and damages to Junction and continue to do so for their personal gain.

62.     Without this Court's intervention, Junction will continue to suffer irreparable injury and damages due to MBS's wrongful misappropriation of Junction's trade secrets.

63.     Junction is entitled to preliminary and permanent injunctive relief, and other relief, including damages, for Junction's loss caused by MBS's misappropriation and for unjust enrichment not taken into account when calculating such actual loss, along with an award for double such actual damages based on the defendants' willful and malicious actions, pursuant to 765 ILCS 1065/3 and 765 ILCS 1065/4.

64.     Pursuant to 765 ILCS 1065/5, Junction is also entitled to an award for its attorneys' fees incurred in bringing this litigation, based on the defendants' willful, malicious and bad faith misappropriation of Junction's confidential and trade secret information.

WHEREFORE, Plaintiff, JUNCTION SOLUTIONS, LLC respectfully requests that this Honorable Court enter an Order granting judgment in its favor and against MBS and the Individual Defendants, and,

a. Order that Defendants and their agents and employees, be enjoined immediately, preliminarily and permanently from developing, using, selling, maintaining, licensing, distributing, copying, publishing, disclosing, marketing, altering, modifying or otherwise benefiting in any way from, any of Junction's confidential, proprietary and trade secret information, including, without limitation, through multi-channel retail software developed or offered by any of the defendants;

b. Enter a Judgment in favor of Junction and against MBS and the Individual Defendants, for their wrongful actions described herein, in an amount to be proven at trial but not less than $5,000,000.00;

c. Enter a Judgment in favor of Junction and against MBS and the Individual Defendants, for their intentional, willful and malicious actions described herein, in an amount not less than $10,000,000.00;

d. Enter a Judgment in favor of Junction and against MBS and the Individual Defendants for Junction's costs, expenses and reasonable attorneys' fees incurred in bringing this action, as provided for under the Agreement and 765 ILCS 1065/5;

e. Enter a Judgment in favor of Junction and against MBS and the Individual in an amount equal to any profits MBS has received as a result of the wrongful actions; and

f. Award Junction such further relief that the Court deems just and appropriate.

## Count III
## Breach of Confidentiality Agreement
### *(Against Ernest, Tucker, and Paul)*

65. Junction realleges and incorporates by reference each of the allegations contained in paragraphs 1-46 as if fully stated herein.

66. Junction fully performed all its obligations under the Confidentiality Agreement by providing the Individual Defendants with training, information, payments and other benefits pursuant to the terms of the Confidentiality Agreement.

16

67.     Pursuant to the terms of the Confidentiality Agreement, the Individual Defendants agreed to be bound by the specific covenants contained in the Confidentiality Agreement. Specifically, the Individual Defendants agreed not to use, and to maintain, the confidentiality of Junction's trade secrets and confidential information.

68.     The Individual Defendants have breached the Confidentiality Agreement in that they, through their employment with MBS, have placed themselves in a relationship with one of Junction's competitors to develop a multi-channel distribution software, which has required them and will continue to require them to disclose and/or use Junction's trade secrets and confidential information.

69.     Pursuant to the Confidentiality Agreement, the Individual Defendants acknowledged and agreed that any breach by them of the terms of the Agreement would result in "immediate, immeasurable and irreparable harm, loss and damage" to Junction and that Junction could immediately seek to restrain such wrongful actions.   The Individual Defendants further acknowledged and agreed that should Junction be forced to initiate legal action against them for their breaches of the terms of the Confidentiality Agreement, they would be responsible for all costs and expenses, including reasonable attorneys' fees incurred therein.

70.     As a direct result of their intentional, wrongful actions in violation of the terms of the Confidentiality Agreement, Junction has sustained immediate, immeasurable and irreparable harm, loss and damage, including but not limited to the loss of the value of the Junction Developments and other related Junction confidential and trade secret material; lost revenue, profits and income; disclosure of the Junction Developments to Junction's competitors and possibly others, and such damages continue to accrue.

17

WHEREFORE, Plaintiff, JUNCTION SOLUTIONS, LLC respectfully requests that this Honorable Court enter an Order granting judgment in its favor and against defendants, ERNEST, TUCKER, AND PAUL, and, specifically:

     a.     Award Junction damages in an amount to be determined at trial, based on the Individual Defendants' intentional breach of the Confidentiality Agreement;

     b.     Award Junction its costs, expenses and reasonable attorneys' fees incurred in bringing this action, pursuant to the express terms of the Confidentiality Agreement; and

     c.     Grant it such further relief as the Court deems just and appropriate.

**Count IV**
**Breach of Employment Agreement**
*(Against Ernest, Tucker, and Paul)*

71.     Junction realleges and incorporates by reference each of the allegations contained in paragraphs 1-46 as if fully stated herein.

72.     Junction fully performed all its obligations under the Employment Agreement by providing the Individual Defendants with their salary, bonuses and other benefits pursuant to the terms of the Employment Agreement.

73.     Pursuant to the terms of the Employment Agreement, the Individual Defendants agreed to be bound by the specific covenants contained in the Agreement. Specifically, the Individual Defendants agreed not to use, and to maintain, the confidentiality of Junction's trade secrets and confidential information.

74.     The Individual Defendants have breached the Employment Agreement in that they, through their employment with MBS, have placed themselves in a relationship with one of Junction's competitors to develop a multi-channel distribution software, which has required them and will continue to require them to disclose and/or use Junction's trade secrets and confidential information.

75.     Pursuant to the Employment Agreement, the Individual Defendants acknowledged and agreed that any breach by them of the terms of the Employment Agreement would result in "immediate, immeasurable and irreparable harm, loss and damage" to Junction and that Junction could immediately seek to restrain such wrongful actions. The Individual Defendants further acknowledged and agreed that should Junction be forced to initiate legal action against them for their breaches of the terms of the Employment Agreement, they would be responsible for all costs and expenses, including reasonable attorneys' fees incurred therein.

76.     As a direct result of their intentional, wrongful actions in violation of the terms of the Employment Agreement, Junction has sustained immediate, immeasurable and irreparable harm, loss and damage, including but not limited to the loss of the value of the Junction Developments and other related Junction confidential and trade secret material; lost revenue, profits and income; disclosure of the Junction Developments to Junction's competitors and possibly others, and such damages continue to accrue.

WHEREFORE, Plaintiff, JUNCTION SOLUTIONS, LLC respectfully requests that this Honorable Court enter an Order granting judgment in its favor and against defendants, ERNEST, TUCKER, AND PAUL, and, specifically:

a.     Award Junction damages in an amount to be determined at trial, based on the Individual Defendants' intentional breach of the Employment Agreement;

b.     Award Junction its costs, expenses and reasonable attorneys' fees incurred in bringing this action, pursuant to the express terms of the Employment Agreement; and

c.     Grant it such further relief as the Court deems just and appropriate.

## COUNT V
### Tortious Interference with a Contract
### *(Against MBS)*

77.     Junction realleges and incorporates by reference each of the allegations contained in paragraphs 1-46 as if fully stated herein.

78.     Junction had a reasonable expectation that the Individual Defendants would comply with the terms of both the Confidentiality Agreement and the Employment Agreement.

79.     By virtue of the wrongful conduct described above, MBS intentionally and unjustifiably induced the Individual Defendants to breach the Confidentiality Agreement and the Employment Agreement.

80.     MBS was well aware of the Individual Defendants' confidentiality obligations to Junction pursuant to the Confidentiality Agreement and Employment Agreement when it induced and conspired with them to disclose Junction's trade secrets and confidential information to it and to third parties for development of a multi-channel distribution software.

81.     Such intentional, tortious interference with the Confidentiality Agreement and the Employment Agreement has caused and continues to cause irreparable harm and damages to Junction, including but not limited to: loss of Junction's customer goodwill, loss of Junction's competitive position, and loss of Junction's current and future business, profits and income. As a result, Junction has sustained irreparable injury and damages, which are continuing.

WHEREFORE, Plaintiff, JUNCTION SOLUTIONS, LLC respectfully requests that this Honorable Court enter an Order granting a judgment in its favor and against all

defendants in an amount to be determined at trial, and grant it such further relief that the Court deems just and appropriate in the circumstances.

## COUNT VI
### Intentional Interference with Prospective Economic Advantage
### *(Against all Defendants)*

82.     Junction realleges and incorporates by reference all allegations contained in paragraphs 1-46 as if fully stated herein.

83.     Junction's development of the Junction Developments and the Junction Multi-Channel Distribution Software, the first and only one of its kind in Junction's industry developed for the Axapta Platform, has given it an advantage over its competitors in the services it has been able to provide to its customers, and Junction has a reasonable expectation of entering into further and/or new long-term business relationships with its clients and prospective clients based on its ability to offer licensing of its Junction Developments and products based thereon.

84.     The Defendants are well aware that the Junction Developments are unique in the market and that they are a source of great value to Junction.

85.     By virtue of the wrongful conduct described above, each of the named defendants has intentionally and unjustifiably interfered with Junction's prospective economic advantage.

86.     Each of the named defendants have intentionally interfered with Junction's prospective economic advantage by disclosing and misappropriating Junction's trade secrets and confidential information in the development and licensing of a multi-channel distribution software that applies and incorporates Junction's trade secrets and confidential information.

21

87. This intentional interference with Junction's prospective economic advantage by all named defendants has caused and continues to cause irreparable injury and damages to Junction, including but not limited to: loss of Junction's customer goodwill, loss of Junction's competitive position, and loss of Junction's future business and income, revenue and profits.

WHEREFORE, Plaintiff, JUNCTION SOLUTIONS, LLC respectfully requests that this Honorable Court enter an Order granting a judgment in its favor and against all named defendants in an amount to be determined at trial, and grant it such further relief that the Court deems just and appropriate in the circumstances.

Dated: March 14, 2006

Respectfully submitted,

JUNCTION MANAGEMENT SOLUTIONS, LLC,
Plaintiff.

By: _____
One of Its Attorneys

Bartly J. Loethen
Kristen M. Lehner
Synergy Law Group, LLC
730 West Randolph Street, 6th Floor
Chicago, Illinois 60661
Telephone: (312) 454-0015
Facsimile: (312) 454-0261

## Junction Management Solutions, LLC - Confidentiality Agreement

This Confidentiality Agreement ("Agreement") is between Junction Management Solutions, LLC (d/b/a Junction Solutions, LLC), a Delaware limited liability company with headquarters in Schaumburg, Illinois, USA ("Company") and _Affinisurity_ a _JEFFREY ERNEST_ with headquarters located at _17548 E. Berea Pl., Aurora, CO._ ("Contractor").

A.     The Company is in the business of marketing, designing, creating, selling business consulting and system integration services (the "Business");

B.     Company wishes to protect its Confidential Information (as defined herein) and will provide certain Confidential Information related to Company's prospective and actual customers in connection with an opportunity to provide services, products and software to such prospective and actual customers of the Company (the "Opportunity"), in order that Company and Contractor may discuss the possible provision of services, products or software by Contractor as a subcontractor of the Company in connection with the Opportunity, and Company requires Contractor to agree to the terms hereof in order for Company to disclose such Confidential Information and the Opportunity;

C.     Company has obligations of confidentiality to third parties in connection with the Opportunity, and therefore requires Contractor's agreements set forth herein.

NOW, THEREFORE, in consideration of the premises, the disclosure of Confidential Information by Company and the promises of Contractor contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Company and Contractor hereby agree as follows:

1.     Nature of Relationship.    Contractor recognizes that Company is only making disclosure of Confidential Information and the Opportunity in reliance on the promises and agreements of Contractor set forth in this Agreement and the parties understand that this Agreement shall NOT be construed as a promise of Company that Contractor will be engaged for provision of services, products or software in connection with the Opportunity and no such engagement shall occur other than by a separate written agreement between Company and Contractor. Contractor understands that Company has no obligation to involve Contractor with the Opportunity and that based upon Contractor's agreements of Section 6 hereof Contractor shall be prohibited from becoming involved with the Opportunity other than as a subcontractor of the Company or as otherwise expressly permitted in writing by the Company.

2.     Additional Confidentiality Agreements.   Contractor agrees that it shall sign and deliver such other reasonable confidentiality agreements for the benefit of Company's prospective and actual customers as may be necessary or desirable in connection with the Opportunity.

3.     Confidentiality Covenant

3.1 Confidential Information.

Contractor acknowledges and agrees, on behalf of itself and its directors, officers and employees, that:

A.     Contractor will be entrusted in strict confidence with (1) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors concerning the Company, including its sales, operations, financial condition, financial projections, profit margins, personnel matters (including the identity of the Company's top-performing personnel, hiring criteria, and training techniques), intermediate and long-term business goals and strategic plans, promotional strategies and techniques, pricing and cost structure of services, customer identities, customer relationship histories, customer records, customer service matters, customer preferences, needs and idiosyncrasies, formal customers and prospects, identity of vendors and suppliers, special vendor and supplier pricing and delivery terms, computer programs and codes, research and development, specifications, algorithms, processes, formulas methods, technical data, know-how complications, designs, drawings, photographs, other machine-readable records, business activity and other confidential aspects of the Company and its business and operations, and information relating to the Opportunity; (2) information which the Company will be required to keep confidential in accordance with confidentiality obligations to third parties, including information relating to the Opportunity; and (3) other matters and materials belonging to or relating to the internal affairs of the Company, including information recorded on any medium which gives it an opportunity to obtain an advantage over its competitors which do not know or use the same or by which the Company derives actual or potential value from such matter or material not generally being known to other persons or entities which might obtain economic value from its use or disclosure (all of the foregoing being hereinafter collectively referred to as the "Confidential Information");

B.     It is imperative that the Contractor treat whatever information Company provides as genuinely "Confidential," and protect such Confidential Information using reasonable safeguards and in any event no less strict than

Contractor Confidentiality Agreement


EXHIBIT
A
ALL-STATE LEGAL®

09/14/2004 TUE 11:00  FAX 925 399 6003 REGUS PLEASANTON

those associated with highest industry standards, including restricting access to such information by pass code, stamping hard copies of information related to the Opportunity as "Confidential," and restricting access to the information related to the Opportunity only to officers and employees who have signed and delivered a confidentiality agreement on terms no less restrictive than the terms of this Agreement.

C.    The Company has developed or purchased and will develop or purchase the Confidential Information at substantial expense in a market in which the Company faces intense competitive pressure, and the Company has kept and will keep secret the Confidential Information;

D.    The Company's information and relationships related to the Opportunity are significant assets belonging to the Company which have been or will be developed through a substantial investment of time, effort, and expense in the Company's worldwide market, and, as a result of Company's disclosures to Contractor, (i) Contractor will have contact with prospective and actual customers of the Company which he would not otherwise have had and (ii) such prospective and actual customers of the Company will associate the Company's goodwill with Contractor;

E.    The Company has developed and will develop a wealth of intimate knowledge regarding its customers, and the identity of the Company's customers is not generally known in the worldwide community in which the Company's businesses are located; and, for these and other reasons, the Company has a legitimate, protectable interest in the identity of its customers and the method of operations of its Business;

F.    Contractor's knowledge regarding the Opportunity will be developed and enhanced as a result of the Company's disclosure of information related to the Opportunity in reliance on Contractor's agreements contained herein;

G.    The Company has a legitimate interest in protecting the goodwill, customer information, customer relationships, information regarding the Opportunity and use of Contractor's skills by means of enforcement of the restrictive covenants set forth in this Agreement;

H.    Nothing in this Agreement shall be deemed or construed to limit or take away any rights the Company may have, at any time, under common law or as to any of the Confidential Information that constitutes a trade secret under

the Illinois Trade Secrets Act or common law.

I.    "Customer" or "client" includes any person or entity (including, but not limited to, state, local, municipal or federal government entities) who is then a customer or client of the Company, or its affiliates or subsidiaries, or anyone who was a customer or client at any time during the twelve-month period prior to or following the date of this Agreement, or prospective customers or clients with which Contractor has knowledge (actual or constructive) that the Company has been negotiating with to become a customer or client of the Company within the twelve-month period prior to or following the date of this Agreement.

3.2 Confidentiality Covenants.

Contractor acknowledges and agrees that:

A.    To the extent that Contractor developed or had access to Confidential Information before entering into this Agreement, Contractor represents and warrants that he has not used for his own benefit or for the benefit of any other person or entity, and he has not disclosed, directly or indirectly, to any other person or entity, other than the Company, any of the Confidential Information.

(i)    The Confidential Information is, and at all times hereafter shall remain, the sole property of the Company;

(ii)    Contractor shall use his best efforts and the utmost diligence to guard and protect the Confidential Information from disclosure to any competitor, customer or supplier of the Company or any other person, firm, corporation, or other entity;

(iii)    Unless the Company gives Contractor prior express written permission, Contractor shall not use for his own benefit, or divulge to or use for the benefit of any competitor or customer or any other person, firm, corporation, or other entity, any of the Confidential Information which Contractor may obtain, learn about, develop, or be entrusted with as a result of Company's disclosures to Contractor; and

(iv)    Contractor shall not seek or accept any Confidential Information related to the Opportunity other than from the Company.

B.    Contractor also acknowledges and agrees that all documentary and tangible

Contractor Confidentiality Agreement

Confidential Information including, without limitation, such Confidential Information as Contractor has committed to memory, is supplied or made available by the Company to Contractor solely to assist in discussions regarding the possible provision of services, products or software as a subcontractor of Company in relation to the Opportunity. Contractor further agrees that upon termination of discussions between Contractor and Company regarding the Opportunity for any reason:

    (i)      Contractor shall not remove from Company property, and shall immediately return to the Company, all documentary or tangible Confidential Information in his possession, custody, or control and not make or keep any copies, notes, abstracts, summaries, tapes or other record of any type of Confidential Information; and

    (ii)      Contractor shall immediately return to the Company any and all other Company property belonging to or within the custody or possession of the Company or as to which the Company has the right of possession, in his possession, custody or control, including, without limitation, all internal manuals, customer or client work papers, data, software, and other written materials (and all copies thereof) prepared for internal use by the Company or used in connection with the Business or operations of the Company, any and all keys, security cards, passes, credit cards, and marketing literature.

4.    Return of Material.  Upon termination of discussions with Company regarding the Opportunity, and regardless of the reason for such termination, Contractor will leave with, or promptly return to Company and its customers all documents, records, notebooks, magnetic tapes, disks or other materials, including all copies in tits possession or control which contain Confidential Information of Company and its customers and prospects or any other information concerning Company and its customers, prospects, products, services or customers, and the Opportunity, whether prepared by the Contractor or others,

5.    Binding Effect and Benefit; Waivers; Governing Law; Amendments. The provisions hereof shall be binding upon, and shall inure to the benefit of, Contractor and the Company, its successors, and assigns; however, Contractor's agreements and obligations under this Agreement are not assignable. No delay on the part of any party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise or waiver thereof by any party of any right or remedy shall preclude the exercise or further exercise thereof or the exercise of any other right or remedy. This Agreement was made and is being delivered in the State of Illinois of the United States of America, and the validity, construction, and the

enforceability of this Agreement shall be governed in all respects by the internal laws of the State of Illinois of the United States of America, without giving effect to principles of conflicts of laws. The parties submit to the jurisdiction and venue of the state and federal courts located within Cook County, Illinois of the United States of America for any legal action or proceeding and for the resolution of any dispute in connection with this Agreement. Each party waives, to the fullest extent permitted by law, (i) any objection which it may now or later have to the laying of venue of any legal action or proceeding arising out of or relating to this Agreement brought in any State or Federal court located in Cook County of the State of Illinois, USA; and (ii) any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum. Any judgment of such courts may be entered in the courts, tribunals and with governmental bodies of any foreign jurisdiction necessary for enforcement thereof. The parties each agree to waive personal service and agree it shall accept service of any process (including, without limitation, any pleading, notice, complaint, etc.) in connection with this Agreement and any legal action, proceeding or dispute in connection therewith by international commercial mail or hand delivery delivered to the respective party at the address set forth on the signature page hereto and which may be (but not need be) made to the attention of any one or more executive personnel of such party, provided that nothing in this Agreement shall affect the right of any person to effect service of process in any manner permitted by law. This Agreement may be modified, amended or supplemented only by execution of a written instrument signed by both Contractor and the Company.

6.    Non-Solicitation Covenant

Contractor acknowledges that by virtue of Company's disclosure of Confidential Information in connection with the Opportunity that Contractor will obtain highly confidential and sensitive information related to the Opportunity. Contractor acknowledges that information possessed by Company related to the Opportunity is a valuable asset of the Company, and that Company has a long-standing business relationship with parties involved with the Opportunity having expended great monetary and personal effort to develop the Opportunity. Furthermore, Contractor acknowledges that but for Company's disclosure of information related to the Opportunity, Contractor would not have had the opportunity for possible engagement in connection with the Opportunity or contact with Company customers and prospective customers and would not have learned of the specific needs and requirements of Company's customers and prospective customers related to the Opportunity.

Contractor agrees that for a period of twelve months following the execution and delivery of this Agreement, Contractor will not, either for himself or on behalf of any other person or entity, directly or indirectly, solicit, attempt or offer to provide services or provide services, competitive with those services rendered or products sold

Contractor Confidentiality Agreement

by or on behalf of the Company, to any past or present customer or prospective customer of the Company identified in connection with the Opportunity.

7.    Equitable Relief. Contractor acknowledges and agrees that the Business of the Company is highly competitive, and that violation of any of the covenants provided for in Sections 3 and 6 of this Agreement would cause immediate, immeasurable and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award. Accordingly, Contractor agrees, without limiting any of the other remedies available to the Company, that any violation of said covenants, or any of them, may be enjoined or restrained by any court of competent jurisdiction, and that any temporary restraining order or emergency, preliminary or final injunctions may be issued by any court of competent jurisdiction, without notice and without bond. In the event any proceedings are commenced by the Company against Contractor for any actual or threatened violation of any of said covenants, the losing party in such proceedings shall be liable to the prevailing party for all reasonable costs and expenses of any kind, including reasonable attorneys' fees, which the prevailing party has incurred in connection with such proceedings.

8.    Severability.   Whenever possible, each of the provisions of this Agreement shall be construed and interpreted in such a manner as to be effective and valid under applicable law. If any provisions of this Agreement, including but not limited to Sections 3 & 6, or the application of any provision of this Agreement to any party or circumstance shall be prohibited by, or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition without invalidating the remainder of such provision, any other provision of this Agreement, or the application of such provision to other parties or circumstances.

9.    Survival.   This Agreement shall not be terminable with respect to the Opportunity and the agreements of Contractor contained herein shall be irrevocable. However, if law or actions of the parties would provide otherwise, the provisions of this Agreement shall survive the termination or revocation for a period of one year thereafter. Notwithstanding the foregoing, the obligations of the parties hereunder shall cease following the three-year anniversary of the date of this Agreement.

10.    Interpretation.   This Agreement is intended to apply and be read narrowly.  This Agreement has been entered into for purposes of enabling Company and Contractor to discuss the Opportunity without risk to Company that Contractor would utilize Confidential Information disclosed by Company related to the Opportunity to circumvent Company. Thus, restrictions on Contractor shall strictly apply as related to the Opportunity.

11. This Agreement may be executed in one or more counterparts and by transmission of a facsimile or digital

image containing the signature of an authorized person, each of which shall be deemed and accepted as an original, and all of which together shall constitute a single instrument. The parties agree that a signature page which is a fax or digital copy containing the signature of the authorized person of a party may be introduced into evidence in any proceeding arising out of or related to this Agreement as if it were an original signature page. Each party represents and warrants that the person executing on behalf of such party has been duly authorized to execute and deliver this Agreement.

Contractor Confidentiality Agreement

In Witness Whereof, this Agreement has been executed
and delivered as of the date set forth below.

Dated: _January 16_ , _2003_ *(2004)*

COMPANY:

Junction Management Solutions, LLC,
d/b/a Junction Solutions, LLC

By: _____
(Signature)

Print Name: _Jeffrey Grell_

Title: _Managing Director_

Address: _Bloomington, CO_

_____

_____

CONTRACTOR:

Company Name:
_Jeffrey Ernkey_

By: _____
(Signature)

Print Name: _Jeffrey Ernkey_

Title: _____

Address: _17548 East Baker Place_

_Aurora, CO. 80013_

_____

Caution to Contractor: This Agreement affects important
rights. DO NOT sign it unless you have read it carefully
and are satisfied that you understand it completely.

## Junction Management Solutions, LLC -
## Confidentiality Agreement

This Confidentiality Agreement ("Agreement") is between Junction Management Solutions, LLC (d/b/a Junction Solutions, LLC), a Delaware limited liability company with headquarters in Schaumburg, Illinois, USA ("Company") and A House H. __Mitchell Tucker__ with __headquarters__ located at __2426 B South Vaughn Way, Aurora Co 80014__ ("Contractor").

A.      The Company is in the business of marketing, designing, creating, selling business consulting and system integration services (the "Business"):

B.      Company wishes to protect its Confidential Information (as defined herein) and will provide certain Confidential Information related to Company's prospective and actual customers in connection with an opportunity to provide services, products and software to such prospective and actual customers of the Company (the "Opportunity"), in order that Company and Contractor may discuss the possible provision of services, products or software by Contractor as a subcontractor of the Company in connection with the Opportunity, and Company requires Contractor to agree to the terms hereof in order for Company to disclose such Confidential Information and the Opportunity;

C.      Company has obligations of confidentiality to third parties in connection with the Opportunity, and Company therefore requires Contractor's agreements set forth herein.

NOW, THEREFORE, in consideration of the premises, the disclosure of Confidential Information by Company and the promises of Contractor contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Company and Contractor hereby agree as follows:

1.      Nature of Relationship.  Contractor recognizes that Company is only making disclosure of Confidential Information and the Opportunity in reliance on the promises and agreements of Contractor set forth in this Agreement and the parties understand that this Agreement shall NOT be construed as a promise of Company that Contractor will be engaged for provision of services, products or software in connection with the Opportunity and no such engagement shall occur other than by a separate written agreement between Company and Contractor. Contractor understands that Company has no obligation to involve Contractor with the Opportunity and that based upon Contractor's agreements of Section 6 hereof Contractor shall be prohibited from becoming involved with the Opportunity other than as a subcontractor of the Company or as otherwise expressly permitted in writing by the Company.

2.      Additional Confidentiality Agreements.  Contractor agrees that it shall sign and deliver such other reasonable confidentiality agreements for the benefit of Company's prospective and actual customers as may be necessary or desirable in connection with the Opportunity.

3.      Confidentiality Covenant

3.1 Confidential Information.

Contractor acknowledges and agrees, on behalf of itself and its directors, officers and employees, that:

A.      Contractor will be entrusted in strict confidence with (1) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors concerning the Company, including its sales, operations, financial condition, financial projections, profit margins, personnel matters (including the identity of the Company's top-performing personnel, hiring criteria, and training techniques), intermediate and long-term business goals and strategic plans, promotional strategies and techniques, pricing and cost structure of services, customer identities, customer relationship histories, customer records, customer service matters, customer preferences, needs and idiosyncrasies, formal customers and prospects, identity of vendors and suppliers, special vendor and supplier pricing and delivery terms, computer programs and codes, research and development, specifications, algorithms, processes, formulas methods, technical data, know-how complications, designs, drawings, photographs, other machine-readable records, business activity and other confidential aspects of the Company and its business and operations, and information relating to the Opportunity; (2) information which the Company will be required to keep confidential in accordance with confidentiality obligations to third parties, including information relating to the Opportunity; and (3) other matters and materials belonging to or relating to the internal affairs of the Company, including information recorded on any medium which gives it an opportunity to obtain an advantage over its competitors which do not know or use the same or by which the Company derives actual or potential value from such matter or material not generally being known to other persons or entities which might obtain economic value from its use or disclosure (all of the foregoing being hereinafter collectively referred to as the "Confidential Information");

B.      It is imperative that the Contractor treat whatever information Company provides as genuinely "Confidential," and protect such Confidential Information using reasonable safeguards and in any event no less strict than

Contractor Confidentiality Agreement



EXHIBIT
B

those associated with highest industry standards, including restricting access to such information by pass code, stamping hard copies of Information related to the Opportunity as "Confidential," and restricting access to the Information related to the Opportunity only to officers and employees who have signed and delivered a confidentiality agreement on terms no less restrictive than the terms of this Agreement.

C.     The Company has developed or purchased and will develop or purchase the Confidential Information at substantial expense in a market in which the Company faces intense competitive pressure, and the Company has kept and will keep secret the Confidential Information;

D.     The Company's information and relationships related to the Opportunity are significant assets belonging to the Company which have been or will be developed through a substantial investment of time, effort, and expense in the Company's worldwide market, and, as a result of Company's disclosures to Contractor, (i) Contractor will have contact with prospective and actual customers of the Company which he would not otherwise have had and (ii) such prospective and actual customers of the Company will associate the Company's goodwill with Contractor;

E.     The Company has developed and will develop a wealth of intimate knowledge regarding its customers, and the identity of the Company's customers is not generally known in the worldwide community in which the Company's businesses are located; and, for these and other reasons, the Company has a legitimate, protectable interest in the identity of its customers and the method of operations of its Business;

F.     Contractor's knowledge regarding the Opportunity will be developed and enhanced as a result of the Company's disclosure of information related to the Opportunity in reliance on Contractor's agreements contained herein;

G.     The Company has a legitimate interest in protecting the goodwill, customer information, customer relationships, Information regarding the Opportunity and use of Contractor's skills by means of enforcement of the restrictive covenants set forth in this Agreement;

H.     Nothing in this Agreement shall be deemed or construed to limit or take away any rights the Company may have, at any time, under common law or as to any of the Confidential Information that constitutes a trade secret under the Illinois Trade Secrets Act or common law.

I.     "Customer" or "client" includes any person or entity (including, but not limited to, state, local, municipal or federal government entities) who is then a customer or client of the Company, or its affiliates or subsidiaries, or anyone who was a customer or client at any time during the twelve-month period prior to or following the date of this Agreement, or prospective customers or clients with which Contractor has knowledge (actual or constructive) that the Company has been negotiating with to become a customer or client of the Company within the twelve-month period prior to or following the date of this Agreement.

3.2 Confidentiality Covenants.

Contractor acknowledges and agrees that:

A.     To the extent that Contractor developed or had access to Confidential Information before entering into this Agreement, Contractor represents and warrants that he has not used for his own benefit or for the benefit of any other person or entity, and he has not disclosed, directly or indirectly, to any other person or entity, other than the Company, any of the Confidential Information.

(i)     The Confidential Information is, and at all times hereafter shall remain, the sole property of the Company;

(ii)     Contractor shall use his best efforts and the utmost diligence to guard and protect the Confidential Information from disclosure to any competitor, customer or supplier of the Company or any other person, firm, corporation, or other entity;

(iii)     Unless the Company gives Contractor prior express written permission, Contractor shall not use for his own benefit, or divulge to or use for the benefit of any competitor or customer or any other person, firm, corporation, or other entity, any of the Confidential Information which Contractor may obtain, learn about, develop, or be entrusted with as a result of Company's disclosures to Contractor; and

(iv)     Contractor shall not seek or accept any Confidential Information related to the Opportunity other than from the Company.

B.     Contractor also acknowledges and agrees that all documentary and tangible

Confidential Information including, without limitation, such Confidential Information as Contractor has committed to memory, is supplied or made available by the Company to Contractor solely to assist in discussions regarding the possible provision of services, products or software as a subcontractor of Company in relation to the Opportunity. Contractor further agrees that upon termination of discussions between Contractor and Company regarding the Opportunity for any reason:

(i) Contractor shall not remove from Company property, and shall immediately return to the Company, all documentary or tangible Confidential Information in his possession, custody, or control and not make or keep any copies, notes, abstracts, summaries, tapes or other record of any type of Confidential Information; and

(ii) Contractor shall immediately return to the Company any and all other Company property belonging to or within the custody or possession of the Company or as to which the Company has the right of possession, in his possession, custody or control, including, without limitation, all internal manuals, customer or client work papers, data, software, and other written materials (and all copies thereof) prepared for internal use by the Company or used in connection with the Business or operations of the Company, any and all keys, security cards, passes, credit cards, and marketing literature.

4. Return of Material. Upon termination of discussions with Company regarding the Opportunity, and regardless of the reason for such termination, Contractor will leave with, or promptly return to Company and its customers all documents, records, notebooks, magnetic tapes, disks or other materials, including all copies in his possession or control which contain Confidential Information of Company and its customers and prospects or any other information concerning Company and its customers, prospects, products, services or customers, and the Opportunity, whether prepared by the Contractor or others.

5. Binding Effect and Benefit; Waivers; Governing Law; Amendments. The provisions hereof shall be binding upon, and shall inure to the benefit of, Contractor and the Company, its successors, and assigns; however, Contractor's agreements and obligations under this Agreement are not assignable. No delay on the part of any party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise or waiver thereof by any party of any right or remedy shall preclude the exercise or further exercise thereof or the exercise of any other right or remedy. This Agreement was made and is being delivered in the State of Illinois of the United States of America, and the validity, construction, and the

enforceability of this Agreement shall be governed in all respects by the internal laws of the State of Illinois of the United States of America, without giving effect to principles of conflicts of laws. The parties submit to the jurisdiction and venue of the state and federal courts located within Cook County, Illinois of the United States of America for any legal action or proceeding and for the resolution of any dispute in connection with this Agreement. Each party waives, to the fullest extent permitted by law, (i) any objection which it may now or later have to the laying of venue of any legal action or proceeding arising out of or relating to this Agreement brought in any State or Federal court located in Cook County of the State of Illinois, USA; and (ii) any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum. Any judgment of such courts may be entered in the courts, tribunals and with governmental bodies of any foreign jurisdiction necessary for enforcement thereof. The parties each agree to waive personal service and agree it shall accept service of any process (including, without limitation, any pleading, notice, complaint, etc.) in connection with this Agreement and any legal action, proceeding or dispute in connection therewith by international commercial mail or hand delivery delivered to the respective party at the address set forth on the signature page hereto and which may be (but not need be) made to the attention of any one or more executive personnel of such party, provided that nothing in this Agreement shall affect the right of any person to effect service of process in any manner permitted by law. This Agreement may be modified, amended or supplemented only by execution of a written instrument signed by both Contractor and the Company.

6. Non-Solicitation Covenant

Contractor acknowledges that by virtue of Company's disclosure of Confidential Information in connection with the Opportunity that Contractor will obtain highly confidential and sensitive information related to the Opportunity. Contractor acknowledges that information possessed by Company related to the Opportunity is a valuable asset of the Company, and that Company has a long-standing business relationship with parties involved with the Opportunity having expended great monetary and personal effort to develop the Opportunity. Furthermore, Contractor acknowledges that but for Company's disclosure of information related to the Opportunity, Contractor would not have had the opportunity for possible engagement in connection with the Opportunity or contact with Company customers and prospective customers and would not have learned of the specific needs and requirements of Company's customers and prospective customers related to the Opportunity.

Contractor agrees that for a period of twelve months following the execution and delivery of this Agreement, Contractor will not, either for himself or on behalf of any other person or entity, directly or indirectly, solicit, attempt or offer to provide services or provide services, competitive with those services rendered or products sold

Contractor Confidentiality Agreement

Page 3 of 5

by or on behalf of the Company, to any past or present customer or prospective customer of the Company identified in connection with the Opportunity.

7.      Equitable Relief. Contractor acknowledges and agrees that the Business of the Company is highly competitive, and that violation of any of the covenants provided for in Sections 3 and 6 of this Agreement would cause immediate, immeasurable and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award. Accordingly, Contractor agrees, without limiting any of the other remedies available to the Company, that any violation of said covenants, or any of them, may be enjoined or restrained by any court of competent jurisdiction, and that any temporary restraining order or emergency, preliminary or final injunctions may be issued by any court of competent jurisdiction, without notice and without bond. In the event any proceedings are commenced by the Company against Contractor for any actual or threatened violation of any of said covenants, the losing party in such proceedings shall be liable to the prevailing party for all reasonable costs and expenses of any kind, including reasonable attorneys' fees, which the prevailing party has incurred in connection with such proceedings.

8.      Severability. Whenever possible, each of the provisions of this Agreement shall be construed and interpreted in such a manner as to be effective and valid under applicable law. If any provisions of this Agreement, including but not limited to Sections 3 & 6, or the application of any provision of this Agreement to any party or circumstance shall be prohibited by, or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition without invalidating the remainder of such provision, any other provision of this Agreement, or the application of such provision to other parties or circumstances.

9.      Survival.   This Agreement shall not be terminable with respect to the Opportunity and the agreements of Contractor contained herein shall be irrevocable. However, if law or actions of the parties would provide otherwise, the provisions of this Agreement shall survive the termination or revocation for a period of one year thereafter. Notwithstanding the foregoing, the obligations of the parties hereunder shall cease following the three-year anniversary of the date of this Agreement.

10.     Interpretation.   This Agreement is intended to apply and be read narrowly. This Agreement has been entered into for purposes of enabling Company and Contractor to discuss the Opportunity without risk to Company that Contractor would utilize Confidential Information disclosed by Company related to the Opportunity to circumvent Company. Thus, restrictions on Contractor shall strictly apply as related to the Opportunity.

11. This Agreement may be executed in one or more counterparts and by transmission of a facsimile or digital image containing the signature of an authorized person, each of which shall be deemed and accepted as an original, and all of which together shall constitute a single instrument. The parties agree that a signature page which is a fax or digital copy containing the signature of the authorized person of a party may be introduced into evidence in any proceeding arising out of or related to this Agreement as if it were an original signature page. Each party represents and warrants that the person executing on behalf of such party has been duly authorized to execute and deliver this Agreement.

Contractor Confidentiality Agreement

In Witness Whereof, this Agreement has been executed and delivered as of the date set forth below.

Dated: _JANUARY 17_, 2003

COMPANY:

Junction Management Solutions, LLC,
d/b/a Junction Solutions, LLC

By: _____
(Signature)

Print Name: _Jeffrey Grell_

Title: _Managing Director_

Address: _Pennsington, CA_

_____

_____


CONTRACTOR:

Company Name:

_____

By: _Mitchell Tucker_
(Signature)

Print Name: _Mitchell Tucker_.

Title: _____

Address: _2426 B So. Vaughn Way_

_Aurora Co 80014_

_____


Caution to Contractor: This Agreement affects important rights. DO NOT sign it unless you have read it carefully and are satisfied that you understand it completely.

**Junction Management Solutions, LLC -**
**Confidentiality Agreement**

This Confidentiality Agreement ("Agreement") is between Junction Management Solutions, LLC (d/b/a Junction Solutions, LLC), a Delaware limited liability company with headquarters in Schaumburg, Illinois, USA ("Company") and ~~Jeffrey Hess~~ *Kenneth R. Paul* with headquarters located at *4754 E. Geddes Ave, Centennial, CO 80122* ("Contractor").

A.     The Company is in the business of marketing, designing, creating, selling business consulting and system integration services (the "Business");

B.     Company wishes to protect its Confidential Information (as defined herein) and will provide certain Confidential Information related to Company's prospective and actual customers in connection with an opportunity to provide services, products and software to such prospective and actual customers of the Company (the "Opportunity"), in order that Company and Contractor may discuss the possible provision of services, products or software by Contractor as a subcontractor of the Company in connection with the Opportunity, and Company requires Contractor to agree to the terms hereof in order for Company to disclose such Confidential Information and the Opportunity;

C.     Company has obligations of confidentiality to third parties in connection with the Opportunity, and Company therefore requires Contractor's agreements set forth herein.

NOW, THEREFORE, in consideration of the premises, the disclosure of Confidential Information by Company and the promises of Contractor contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Company and Contractor hereby agree as follows:

1.     Nature of Relationship.   Contractor recognizes that Company is only making disclosure of Confidential Information and the Opportunity in reliance on the promises and agreements of Contractor set forth in this Agreement and the parties understand that this Agreement shall NOT be construed as a promise of Company that Contractor will be engaged for provision of services, products or software in connection with the Opportunity and no such engagement shall occur other than by a separate written agreement between Company and Contractor.  Contractor understands that Company has no obligation to involve Contractor with the Opportunity and that based upon Contractor's agreements of Section 6 hereof Contractor shall be prohibited from becoming involved with the Opportunity other than as a subcontractor of the Company or as otherwise expressly permitted in writing by the Company.

2.     Additional Confidentiality Agreements.   Contractor agrees that it shall sign and deliver such other reasonable confidentiality agreements for the benefit of Company's prospective and actual customers as may be necessary or desirable in connection with the Opportunity.

3.     Confidentiality Covenant

3.1   Confidential Information.

Contractor acknowledges and agrees, on behalf of itself and its directors, officers and employees, that:

A.     Contractor will be entrusted in strict confidence with (1) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors concerning the Company, including its sales, operations, financial condition, financial projections, profit margins, personnel matters (including the identity of the Company's top-performing personnel, hiring criteria, and training techniques), intermediate and long-term business goals and strategic plans, promotional strategies and techniques, pricing and cost structure of services, customer identities, customer relationship histories, customer records, customer service matters, customer preferences, needs and idiosyncrasies, formal customers and prospects, identity of vendors and suppliers, special vendor and supplier pricing and delivery terms, computer programs and codes, research and development, specifications, algorithms, processes, formulas methods, technical data, know-how complications, designs, drawings, photographs, other machine-readable records, business activity and other confidential aspects of the Company and its business and operations, and information relating to the Opportunity; (2) information which the Company will be required to keep confidential in accordance with confidentiality obligations to third parties, including information relating to the Opportunity; and (3) other matters and materials belonging to or relating to the internal affairs of the Company, including information recorded on any medium which gives it an opportunity to obtain an advantage over its competitors which do not know or use the same or by which the Company derives actual or potential value from such matter or material not generally being known to other persons or entities which might obtain economic value from its use or disclosure (all of the foregoing being hereinafter collectively referred to as the "Confidential Information");

B.     It is imperative that the Contractor treat whatever information Company provides as genuinely "Confidential," and protect such Confidential Information using reasonable safeguards and in any event no less strict than

**EXHIBIT**
**C**

Contractor Confidentiality Agreement

Page 1 of 5

those associated with highest industry standards, including restricting access to such information by pass code, stamping hard copies of information related to the Opportunity as "Confidential," and restricting access to the information related to the Opportunity only to officers and employees who have signed and delivered a confidentiality agreement on terms no less restrictive than the terms of this Agreement.

C.   The Company has developed or purchased and will develop or purchase the Confidential Information at substantial expense in a market in which the Company faces intense competitive pressure, and the Company has kept and will keep secret the Confidential Information;

D.   The Company's information and relationships related to the Opportunity are significant assets belonging to the Company which have been or will be developed through a substantial investment of time, effort, and expense in the Company's worldwide market, and, as a result of Company's disclosures to Contractor, (i) Contractor will have contact with prospective and actual customers of the Company which he would not otherwise have had and (ii) such prospective and actual customers of the Company will associate the Company's goodwill with Contractor;

E.   The Company has developed and will develop a wealth of intimate knowledge regarding its customers, and the identity of the Company's customers is not generally known in the worldwide community in which the Company's businesses are located; and, for these and other reasons, the Company has a legitimate, protectable interest in the identity of its customers and the method of operations of its Business;

F.   Contractor's knowledge regarding the Opportunity will be developed and enhanced as a result of the Company's disclosure of information related to the Opportunity in reliance on Contractor's agreements contained herein;

G.   The Company has a legitimate interest in protecting the goodwill, customer information, customer relationships, information regarding the Opportunity and use of Contractor's skills by means of enforcement of the restrictive covenants set forth in this Agreement;

H.   Nothing in this Agreement shall be deemed or construed to limit or take away any rights the Company may have, at any time, under common law or as to any of the Confidential Information that constitutes a trade secret under

the Illinois Trade Secrets Act or common law.

I.   "Customer" or "client" includes any person or entity (including, but not limited to, state, local, municipal or federal government entities) who is then a customer or client of the Company, or its affiliates or subsidiaries, or anyone who was a customer or client at any time during the twelve-month period prior to or following the date of this Agreement, or prospective customers or clients with which Contractor has knowledge (actual or constructive) that the Company has been negotiating with to become a customer or client of the Company within the twelve-month period prior to or following the date of this Agreement.

3.2 Confidentiality Covenants.

Contractor acknowledges and agrees that:

A.   To the extent that Contractor developed or had access to Confidential Information before entering into this Agreement, Contractor represents and warrants that he has not used for his own benefit or for the benefit of any other person or entity, and he has not disclosed, directly or indirectly, to any other person or entity, other than the Company, any of the Confidential Information.

(i)   The Confidential Information is, and at all times hereafter shall remain, the sole property of the Company;

(ii)   Contractor shall use his best efforts and the utmost diligence to guard and protect the Confidential Information from disclosure to any competitor, customer or supplier of the Company or any other person, firm, corporation, or other entity;

(iii)   Unless the Company gives Contractor prior express written permission, Contractor shall not use for his own benefit, or divulge to or use for the benefit of any competitor or customer or any other person, firm, corporation, or other entity, any of the Confidential Information which Contractor may obtain, learn about, develop, or be entrusted with as a result of Company's disclosures to Contractor; and

(iv)   Contractor shall not seek or accept any Confidential Information related to the Opportunity other than from the Company.

B.   Contractor also acknowledges and agrees that all documentary and tangible

Confidential Information including, without limitation, such Confidential Information as Contractor has committed to memory, is supplied or made available by the Company to Contractor solely to assist in discussions regarding the possible provision of services, products or software as a subcontractor of Company in relation to the Opportunity. Contractor further agrees that upon termination of discussions between Contractor and Company regarding the Opportunity for any reason:

    (i)    Contractor shall not remove from Company property, and shall immediately return to the Company, all documentary or tangible Confidential Information in his possession, custody, or control and not make or keep any copies, notes, abstracts, summaries, tapes or other record of any type of Confidential Information; and

    (ii)    Contractor shall immediately return to the Company any and all other Company property belonging to or within the custody or possession of the Company or as to which the Company has the right of possession, in his possession, custody or control, including, without limitation, all internal manuals, customer or client work papers, data, software, and other written materials (and all copies thereof) prepared for internal use by the Company or used in connection with the Business or operations of the Company, any and all keys, security cards, passes, credit cards, and marketing literature.

4.    Return of Material.  Upon termination of discussions with Company regarding the Opportunity, and regardless of the reason for such termination, Contractor will leave with, or promptly return to Company and its customers all documents, records, notebooks, magnetic tapes, disks or other materials, including all copies in its possession or control which contain Confidential Information of Company and its customers and prospects or any other information concerning Company and its customers, prospects, products, services or customers, and the Opportunity, whether prepared by the Contractor or others.

5.    Binding Effect and Benefit; Waivers; Governing Law; Amendments. The provisions hereof shall be binding upon, and shall inure to the benefit of, Contractor and the Company, its successors, and assigns; however, Contractor's agreements and obligations under this Agreement are not assignable. No delay on the part of any party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise or waiver thereof by any party of any right or remedy shall preclude the exercise or further exercise thereof or the exercise of any other right or remedy. This Agreement was made and is being delivered in the State of Illinois of the United States of America, and the validity, construction, and the

enforceability of this Agreement shall be governed in all respects by the internal laws of the State of Illinois of the United States of America, without giving effect to principles of conflicts of laws. The parties submit to the jurisdiction and venue of the state and federal courts located within Cook County, Illinois of the United States of America for any legal action or proceeding and for the resolution of any dispute in connection with this Agreement. Each party waives, to the fullest extent permitted by law, (i) any objection which it may now or later have to the laying of venue of any legal action or proceeding arising out of or relating to this Agreement brought in any State or Federal court located in Cook County of the State of Illinois, USA; and (ii) any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum. Any judgment of such courts may be entered in the courts, tribunals and with governmental bodies of any foreign jurisdiction necessary for enforcement thereof. The parties each agree to waive personal service and agree it shall accept service of any process (including, without limitation, any pleading, notice, complaint, etc.) in connection with this Agreement and any legal action, proceeding or dispute in connection therewith by international commercial mail or hand delivery delivered to the respective party at the address set forth on the signature page hereto and which may be (but not need be) made to the attention of any one or more executive personnel of such party, provided that nothing in this Agreement shall affect the right of any person to effect service of process in any manner permitted by law. This Agreement may be modified, amended or supplemented only by execution of a written instrument signed by both Contractor and the Company.

6.    Non-Solicitation Covenant

Contractor acknowledges that by virtue of Company's disclosure of Confidential Information in connection with the Opportunity that Contractor will obtain highly confidential and sensitive information related to the Opportunity. Contractor acknowledges that information possessed by Company related to the Opportunity is a valuable asset of the Company, and that Company has a long-standing business relationship with parties involved with the Opportunity having expended great monetary and personal effort to develop the Opportunity. Furthermore, Contractor acknowledges that but for Company's disclosure of information related to the Opportunity, Contractor would not have had the opportunity for possible engagement in connection with the Opportunity or contact with Company customers and prospective customers and would not have learned of the specific needs and requirements of Company's customers and prospective customers related to the Opportunity.

Contractor agrees that for a period of twelve months following the execution and delivery of this Agreement, Contractor will not, either for himself or on behalf of any other person or entity, directly or indirectly, solicit, attempt or offer to provide services or provide services, competitive with those services rendered or products sold

by or on behalf of the Company, to any past or present customer or prospective customer of the Company identified in connection with the Opportunity.

7.     Equitable Relief. Contractor acknowledges and agrees that the Business of the Company is highly competitive, and that violation of any of the covenants provided for in Sections 3 and 6 of this Agreement would cause immediate, immeasurable and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award. Accordingly, Contractor agrees, without limiting any of the other remedies available to the Company, that any violation of said covenants, or any of them, may be enjoined or restrained by any court of competent jurisdiction, and that any temporary restraining order or emergency, preliminary or final injunctions may be issued by any court of competent jurisdiction, without notice and without bond. In the event any proceedings are commenced by the Company against Contractor for any actual or threatened violation of any of said covenants, the losing party in such proceedings shall be liable to the prevailing party for all reasonable costs and expenses of any kind, including reasonable attorneys' fees, which the prevailing party has incurred in connection with such proceedings.

8.     Severability. Whenever possible, each of the provisions of this Agreement shall be construed and interpreted in such a manner as to be effective and valid under applicable law. If any provisions of this Agreement, including but not limited to Sections 3 & 6, or the application of any provision of this Agreement to any party or circumstance shall be prohibited by, or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition without invalidating the remainder of such provision, any other provision of this Agreement, or the application of such provision to other parties or circumstances.

9.     Survival. This Agreement shall not be terminable with respect to the Opportunity and the agreements of Contractor contained herein shall be irrevocable. However, if law or actions of the parties would provide otherwise, the provisions of this Agreement shall survive the termination or revocation for a period of one year thereafter. Notwithstanding the foregoing, the obligations of the parties hereunder shall cease following the three-year anniversary of the date of this Agreement.

10.     Interpretation. This Agreement is intended to apply and be read narrowly. This Agreement has been entered into for purposes of enabling Company and Contractor to discuss the Opportunity without risk to Company that Contractor would utilize Confidential Information disclosed by Company related to the Opportunity to circumvent Company. Thus, restrictions on Contractor shall strictly apply as related to the Opportunity.

11. This Agreement may be executed in one or more counterparts and by transmission of a facsimile or digital

image containing the signature of an authorized person, each of which shall be deemed and accepted as an original, and all of which together shall constitute a single instrument. The parties agree that a signature page which is a fax or digital copy containing the signature of the authorized person of a party may be introduced into evidence in any proceeding arising out of or related to this Agreement as if it were an original signature page. Each party represents and warrants that the person executing on behalf of such party has been duly authorized to execute and deliver this Agreement.

Contractor Confidentiality Agreement

In Witness Whereof, this Agreement has been executed
and delivered as of the date set forth below.

Dated: _January 16_, ~~2003~~ 2004

COMPANY:

Junction Management Solutions, LLC,
d/b/a Junction Solutions, LLC

By: _____
                    (Signature)

Print Name: _Jeffrey J Covell_

Title: _Managing Director_

Address: _Pleasanton, CA._

_____

_____


CONTRACTOR:

Company Name: _Kenneth R. Paul_

By: _Kenneth R. Paul_
              (Signature)

Print Name: _Kenneth R. Paul_

Title: _Contract Programmer_

Address: _4254 E. Caley Ave._
_Centennial, Co 80122_

_____

Caution to Contractor:  This Agreement affects important
rights.  DO NOT sign it unless you have read it carefully
and are satisfied that you understand it completely.

# Employee Agreement

To be completed on the employee's first day of employment

I, JEFFREY ERNST, the "Employee", having accepted the offer of employment by Junction Management Solutions, LLC ("Junction") as described in the attached "Offer Letter", recognize such employment is subject to the following terms and conditions and are a condition of my employment. My employment begins on JULY 1, 2004.

In order to induce Junction to hire, continue to employ and retain me, and to disclose to me or allow me access to certain confidential matters and information which are of great value to Junction, I agree to execute this agreement.

1. While employed by Junction, I agree to devote my full time and best efforts towards the performance of my duties and responsibilities. I will refrain from engaging directly or indirectly in any activities, pursuits, or business transactions which in any way compete with any operation of Junction, or which may result in a conflict of interest or otherwise adversely affect the proper discharge of my duties and responsibilities.

2. While employed by Junction, I will strictly adhere to all of the policies, rules and regulations of Junction which are presently in force or which may be established with respect to the conduct of employees. I will follow the directions of Junction with respect to the methods I use to perform my duties, recognizing that Junction may amend, revise, or discontinue its policies and procedures from time to time.

3. I understand Junction's preeminent business objective is to provide superior value and service to its clients, and that significant travel may be required to fulfill my duties to Junction and meet the needs of its clients.

4. While employed by Junction, I will not become a principal, director, officer, or employee of, or consultant to, any entity or individual which is in competition with Junction or its subsidiaries, affiliates, or assigns. Furthermore, I will not engage in or own or control any interest in any entity or individual which is in competition with Junction, except as a passive investor in publicly held companies. Any entity or individual engaged in business or information technology consulting is considered a competitor of Junction.

5. While employed by Junction and for two years thereafter, I will not hire any of the employees of Junction, or directly or indirectly induce any employees of Junction to leave the employ of Junction. I further agree to not induce or accept employment from current, former or potential clients of Junction. Not withstanding the foregoing, if I wish to engage in employment with a Client of Junction and I believe such employment will not harm Junction, then I may petition Junction for a waiver of this provision, which Junction may not unreasonably withhold. "Potential client" is defined as any entity or individual to or for whom Junction has submitted a proposal for services, or with whom Junction has had significant sales or marketing discussions, but with whom Junction did not enter into a contractual agreement.

6. While employed by Junction and for two years thereafter, I will not directly or indirectly provide, or solicit in an attempt to provide, any service offered by Junction to or for any client, or potential client of Junction. For purposes of this provision not to solicit, it is agreed



EXHIBIT
D

Junction Solutions, LLC
Employee Agreement

that client or potential client shall mean those clients or potential clients of Junction with whom I have had a direct consulting relationship while in Junction's employment; been involved in actively soliciting for engagements on Junction's behalf; or those where I provided consultative or advisory services to a Junction employee in charge of a client engagement at any time during the twelve months prior to termination of my employment. I further agree not to discuss any matter regarding my potential or actual termination of employment from Junction with any Junction client, or potential client, except as Junction shall determine appropriate.

7.  I agree to forever hold in confidence, and not use or disclose, all proprietary information, trade secrets, and confidential business and technical information which I may acquire as a result of my employment with Junction, except to further Junction's interests and as authorized by Junction. This information may include, but is not limited to Junction business plans, methodologies, technologies (including computer software), intellectual property, training materials, personnel information, client lists, financial information, pricing information, and information concerning the business, technologies, needs, plans, and strategies of Junction's clients.

8.  I agree to assign to Junction all of my rights, title, and interest in and to all inventions and all improvements on existing inventions that I create or discover while employed by Junction relating to Junction's business or the performance of my duties. I will disclose any such invention or improvement thereon promptly to Junction and will execute all such reasonable documents as Junction may request to confirm the assignment of my rights in and to any such invention or improvement. If requested by Junction, I will provide all assistance it reasonably requires (at Junction's expense) to file for, maintain, protect, and enforce Junction's patents, copyrights, trademarks, trade secrets, and other rights and inventions. For the purposes of this agreement, the term "invention" means discoveries, processes, technologies, designs, and other intellectual property.

9.  I acknowledge that the injury to Junction resulting from my violation of any of the terms and conditions of this agreement cannot be adequately compensated by money damages, and, accordingly, in event of breach or threatened breach of any provision herein, Junction shall be entitled to injunctions, both preliminary and final, enjoining and restraining such breach or threatened breach. Additionally, Junction shall be entitled to retain any and all monies including, but not limited to, any equity share(s) I hold in Junction and any other sums which are otherwise due to me from Junction from any source (other than from Junction's defined Benefit Plan or from my balance in Junction's 401(k) voluntary retirement plan). Such remedies shall be in addition to all other remedies available at law or in equity, including Junction's right to recover from me any and all damages that may be sustained as a result of my breach of this agreement. Junction shall be entitled to recover its attorneys' fees and expenses in any successful action by Junction to enforce this agreement.

10. Miscellaneous Provisions

    a.  *Severability*. If any clause or provision of this agreement shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision, which shall remain in full force and effect.

    b.  *Governing Law*. This agreement shall be governed by the laws of the state of Illinois. The Circuit Court of Cook County, Illinois shall have jurisdiction over any dispute, which

2

Junction Solutions, LLC
Employee Agreement

arises under this agreement, and each of the parties shall submit and hereby consents to such court's exercise of jurisdiction.

c.  *Waiver of Breach.*  I understand that the waiver by Junction of my breach of any provision of this agreement shall not operate or be construed as a waiver of any subsequent breach I may incur. Likewise, my waiver of a breach of any provision of this agreement by Junction shall not operate or be construed as my waiver of any subsequent breach by Junction.

d.  *Employment by Subsidiary.*  If Junction owns, acquires, or forms subsidiary companies or becomes connected with other affiliate companies, or is acquired by another entity, I agree to be employed by any such entities under the same terms and conditions set forth in this agreement.

e.  *Employee Shall Not Assign Agreement.*  I understand that this agreement and all rights hereunder are personal to me and shall not be assignable by me, and any purported assignment shall be null and void and shall not be binding on Junction.

f.  *Employee May Not Bind Junction.*  I understand that I may not enter into any contract or otherwise bind Junction in any way without written authority from Junction. Any contracts which I may enter into without written authorization will not be binding upon Junction.

g.  *Notices.*  I understand any notices required or permitted to be given under this agreement shall be sufficient if in writing, and if sent by registered mail to my residence, or the principal office of Junction, respectively.

h.  *Amendment and Alteration.*  No amendment or alteration of the terms of this agreement shall be valid unless made in writing and signed by Junction and myself.

****

I understand and agree to the terms and conditions set forth in this Employee Agreement.

_____
Employee

Accepted by Junction Solutions, LLC

_____         _____
Managing Director                        Date  7/4/04

3

# Employee Agreement

To be completed on the employee's first day of employment

I, _Michael Tucker_ the "Employee", having accepted the offer of employment by Junction Management Solutions, LLC ("Junction") as described in the attached "Offer Letter", recognize such employment is subject to the following terms and conditions and are a condition of my employment. My employment begins on _July 1, 2004_.

In order to induce Junction to hire, continue to employ and retain me, and to disclose to me or allow me access to certain confidential matters and information which are of great value to Junction, I agree to execute this agreement.

1. While employed by Junction, I agree to devote my full time and best efforts towards the performance of my duties and responsibilities. I will refrain from engaging directly or indirectly in any activities, pursuits, or business transactions which in any way compete with any operation of Junction, or which may result in a conflict of interest or otherwise adversely affect the proper discharge of my duties and responsibilities.

2. While employed by Junction, I will strictly adhere to all of the policies, rules and regulations of Junction which are presently in force or which may be established with respect to the conduct of employees. I will follow the directions of Junction with respect to the methods I use to perform my duties, recognizing that Junction may amend, revise, or discontinue its policies and procedures from time to time.

3. I understand Junction's preeminent business objective is to provide superior value and service to its clients, and that significant travel may be required to fulfill my duties to Junction and meet the needs of its clients.

4. While employed by Junction, I will not become a principal, director, officer, or employee of, or consultant to, any entity or individual which is in competition with Junction or its subsidiaries, affiliates, or assigns. Furthermore, I will not engage in or own or control any interest in any entity or individual which is in competition with Junction, except as a passive investor in publicly held companies. Any entity or individual engaged in business or information technology consulting is considered a competitor of Junction.

5. While employed by Junction and for two years thereafter, I will not hire any of the employees of Junction, or directly or indirectly induce or attempt to induce any employees of Junction to leave the employ of Junction. I further agree to not induce or accept employment from current, former or potential clients of Junction. Not withstanding the foregoing, if I wish to engage in employment with a Client of Junction and I believe such employment will not harm Junction, then I may petition Junction for a waiver of this provision, which Junction may not unreasonably withhold. "Potential client" is defined as any entity or individual to or for whom Junction has submitted a proposal for services, or with whom Junction has had significant sales or marketing discussions, but with whom Junction did not enter into a contractual agreement.

6. While employed by Junction and for two years thereafter, I will not directly or indirectly provide, or solicit in an attempt to provide, any service offered by Junction to or for any client, or potential client of Junction. For purposes of this provision not to solicit, it is agreed



ALL-STATE LEGAL® EXHIBIT E

Junction Solutions, LLC
Employee Agreement

that client or potential client shall mean those clients or potential clients of Junction with whom I have had a direct consulting relationship while in Junction's employment; been involved in actively soliciting for engagements on Junction's behalf; or those where I provided consultative or advisory services to a Junction employee in charge of a client engagement at any time during the twelve months prior to termination of my employment. I further agree not to discuss any matter regarding my potential or actual termination of employment from Junction with any Junction client, or potential client, except as Junction shall determine appropriate.

7. I agree to forever hold in confidence, and not use or disclose, all proprietary information, trade secrets, and confidential business and technical information which I may acquire as a result of my employment with Junction, except to further Junction's interests and as authorized by Junction. This information may include, but is not limited to Junction business plans, methodologies, technologies (including computer software), intellectual property, training materials, personnel information, client lists, financial information, pricing information, and information concerning the business, technologies, needs, plans, and strategies of Junction's clients.

8. I agree to assign to Junction all of my rights, title, and interest in and to all inventions and all improvements on existing inventions that I create or discover while employed by Junction relating to Junction's business or the performance of my duties. I will disclose any such invention or improvement thereon promptly to Junction and will execute all such reasonable documents as Junction may request to confirm the assignment of my rights in and to any such invention or improvement. If requested by Junction, I will provide all assistance it reasonably requires (at Junction's expense) to file for, maintain, protect, and enforce Junction's patents, copyrights, trademarks, trade secrets, and other rights and inventions. For the purposes of this agreement, the term "invention" means discoveries, processes, technologies, designs, and other intellectual property.

9. I acknowledge that the injury to Junction resulting from my violation of any of the terms and conditions of this agreement cannot be adequately compensated by money damages, and, accordingly, in event of breach or threatened breach of any provision herein, Junction shall be entitled to injunctions, both preliminary and final, enjoining and restraining such breach or threatened breach. Additionally, Junction shall be entitled to retain any and all monies including, but not limited to, any equity share(s) I hold in Junction and any other sums which are otherwise due to me from Junction from any source (other than from Junction's defined Benefit Plan or from my balance in Junction's 401(k) voluntary retirement plan). Such remedies shall be in addition to all other remedies available at law or in equity, including Junction's right to recover from me any and all damages that may be sustained as a result of my breach of this agreement. Junction shall be entitled to recover its attorneys' fees and expenses in any successful action by Junction to enforce this agreement.

10. Miscellaneous Provisions

    a. *Severability.* If any clause or provision of this agreement shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision, which shall remain in full force and effect.

    b. *Governing Law.* This agreement shall be governed by the laws of the state of Illinois. The Circuit Court of Cook County, Illinois shall have jurisdiction over any dispute, which

2

Junction Solutions, LLC
Employee Agreement

arises under this agreement, and each of the parties shall submit and hereby consents to such court's exercise of jurisdiction.

c. *Waiver of Breach.* I understand that the waiver by Junction of my breach of any provision of this agreement shall not operate or be construed as a waiver of any subsequent breach I may incur. Likewise, my waiver of a breach of any provision of this agreement by Junction shall not operate or be construed as my waiver of any subsequent breach by Junction.

d. *Employment by Subsidiary.* If Junction owns, acquires, or forms subsidiary companies or becomes connected with other affiliate companies, or is acquired by another entity, I agree to be employed by any such entities under the same terms and conditions set forth in this agreement.

e. *Employee Shall Not Assign Agreement.* I understand that this agreement and all rights hereunder are personal to me and shall not be assignable by me, and any purported assignment shall be null and void and shall not be binding on Junction.

f. *Employee May Not Bind Junction.* I understand that I may not enter into any contract or otherwise bind Junction in any way without written authority from Junction. Any contracts which I may enter into without written authorization will not be binding upon Junction.

g. *Notices.* I understand any notices required or permitted to be given under this agreement shall be sufficient if in writing, and if sent by registered mail to my residence, or the principal office of Junction, respectively.

h. *Amendment and Alteration.* No amendment or alteration of the terms of this agreement shall be valid unless made in writing and signed by Junction and myself.

****

I understand and agree to the terms and conditions set forth in this Employee Agreement.

_____
Employee

Accepted by Junction Solutions, LLC

_____                    _____
Managing Director                           Date

3

# Employee Agreement
### To be completed on the employee's first day of employment

I, _K. Paul_, the "Employee", having accepted the offer of employment by Junction Management Solutions, LLC ("Junction") as described in the attached "Offer Letter", recognize such employment is subject to the following terms and conditions and are a condition of my employment. My employment begins on _7 / 1 / 04_.

In order to induce Junction to hire, continue to employ and retain me, and to disclose to me or allow me access to certain confidential matters and information which are of great value to Junction, I agree to execute this agreement.

1.  While employed by Junction, I agree to devote my full time and best efforts towards the performance of my duties and responsibilities. I will refrain from engaging directly or indirectly in any activities, pursuits, or business transactions which in any way compete with any operation of Junction, or which may result in a conflict of interest or otherwise adversely affect the proper discharge of my duties and responsibilities.

2.  While employed by Junction, I will strictly adhere to all of the policies, rules and regulations of Junction which are presently in force or which may be established with respect to the conduct of employees. I will follow the directions of Junction with respect to the methods I use to perform my duties, recognizing that Junction may amend, revise, or discontinue its policies and procedures from time to time.

3.  I understand Junction's preeminent business objective is to provide superior value and service to its clients, and that significant travel may be required to fulfill my duties to Junction and meet the needs of its clients.

4.  While employed by Junction, I will not become a principal, director, officer, or employee of, or consultant to, any entity or individual which is in competition with Junction or its subsidiaries, affiliates, or assigns. Furthermore, I will not engage in or own or control any interest in any entity or individual which is in competition with Junction, except as a passive investor in publicly held companies. Any entity or individual engaged in business or information technology consulting is considered a competitor of Junction.

5.  While employed by Junction and for two years thereafter, I will not hire any of the employees of Junction, or directly or indirectly induce or attempt to induce any employees of Junction to leave the employ of Junction. I further agree to not induce or accept employment from current, former or potential clients of Junction. Not withstanding the foregoing, if I wish to engage in employment with a Client of Junction and I believe such employment will not harm Junction, then I may petition Junction for a waiver of this provision, which Junction may not unreasonably withhold. "Potential client" is defined as any entity or individual to or for whom Junction has submitted a proposal for services, or with whom Junction has had significant sales or marketing discussions, but with whom Junction did not enter into a contractual agreement.

6.  While employed by Junction and for two years thereafter, I will not directly or indirectly provide, or solicit in an attempt to provide, any service offered by Junction to or for any client, or potential client of Junction. For purposes of this provision not to solicit, it is agreed



EXHIBIT

F

ALL-STATE LEGAL®



**PRWeb™**
PRESS RELEASE
N E W S W I R E

## Iteration2 Adds Multi-Channel Capabilities to their Microsoft Dynamics AX Industry Solutions

*Iteration2 and software development leader MBSDEV extend Dynamics AX functionality to Multi-Channel Distributors.*

Irvine, CA (PRWEB) February 17, 2006 -- Iteration2 (www.iteration2.com), the fastest growing Microsoft Dynamics (formerly Microsoft Business Solutions) Gold Certified Partner and 2005 Microsoft US Partner of the Year, announced that they have teamed up with multi-channel distribution pioneer MBS Dev to enhance their industry leading solutions, integrated with Microsoft Dynamics AX (formerly Axapta) to provide an enterprise platform today and in the future.

"Agile customers require industry specific solutions with multi-channel capabilities for their growing business," stated Greg Carter, Vice President of Iteration2. "Integrating these with a proven and flexible ERP solution – Microsoft Dynamics AX provides customers with better visibility, greater efficiency, and higher customer satisfaction and loyalty. MBS Dev had the experience and expertise to enable our delivery of these capabilities quicker to the marketplace," Carter adds.

"MBS Dev has been focused on creating vertical extensions for distribution organizations on Microsoft Dynamics AX. Many of our customers are extending there channels to include both B to B and B to C distribution," stated Laura Guillaume, President of MBS Dev. "We realized we needed to offer this functionality to meet the needs of these changing organizations. Iteration2 has proven solutions, tremendous technical skills in Microsoft technologies, and a rapidly growing customer base, thus they were a natural for us to partner with. We are very excited about our partnership with Iteration2 to extend this offering to the Multi-Channel Distribution companies."

Iteration2 is developing a series of webcasts entitled "Taking Advantage of Multi-Channel Industry Solutions." The series will be directed towards manufacturing and distribution organizations with multi-channel retail requirements.

"With MBS Dev we were able to extend Microsoft Dynamics AX to integrate with our retail POS solution, manage our many distribution channels and enable both our warehousing and manufacturing facilities with an advanced technology solution," said Jeff Schwartz, COO of L C Industries, a MBS Dev customer.

About Iteration2
Iteration2 provides its clients with a superior enterprise software implementation experience at an attractive price. This combined with Microsoft integrated technology stack and unsurpassed financial strength provides a platform for today and tomorrow. Iteration2 is a Microsoft Gold Certified Partner, a leading provider of Microsoft Dynamics – AX (formerly Microsoft Axapta), and the 2005 US MBS Partner of the Year.

Iteration2's vertical industry expertise, enterprise software industry domain experience, and exceptional technical skills with Microsoft technologies provide their clients with clear strategic business advantage. Iteration2 is based in Irvine, CA and has sales offices in strategic locations throughout the United States. Please visit the company's website at www.iteration2.com.

About MBSDEV
MBS Dev, Inc. is a Colorado corporation founded to assist both Microsoft Axapta customers and reselling

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Please do not contact PR Web. We will be unable to assist you with your inquiry. PR Web disclaims any content contained in these releases. Our complete disclaimer appears here.*



**PRWeb™**
PRESS RELEASE
NEWSWIRE

partners with distribution industry vertical solutions, development requirements and support services. MBS Dev, Inc. is a certified Value Added Reseller (VAR) and Independent Software Vendor (ISV) partner for Microsoft Axapta.

 MBS Dev has a multi-channel distribution industry vertical focus, allowing us to truly differentiate ourselves with our vertical solutions. The MBS Dev focus is to deliver vertical specific applications that provide the required functionality specific to the industry. MBS Dev provides maximum value and service to its clients through a dynamic combination of professional talent, extensive technical expertise and teamwork. For more information on MBS Dev, visit http://www.mbsdev.com

For more information:
Greg Sad,
Marketing Director
Iteration2
(949) 789-1020

# # #

**Contact Information**
**Greg Sad**
Iteration2
http://www.iteration2.com
949-789-1020

If you have any questions regarding information in these press releases please contact the company listed in the press release. Please do not contact PR Web. We will be unable to assist you with your inquiry. PR Web disclaims any content contained in these releases. Our complete disclaimer appears here.

# EXHIBIT B

| 2120 - Served | 2121 - Served | |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | CCG N001-10M-1-07-05 |

ADAMS COUNTY
SHERIFF'S OFFICE

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT,** Chancery Division **DIVISION**

(Name all parties)
Junction Solutions, LLC f/k/a Junction Management Solutions
a Delaware Limited Liability Company, Plaintiff

v.

MBS Dev. Inc., a Colorado Corporation, et al,,
Defendants

**06CH05091**

No. _____

Jury Demanded

**SUMMONS**

To each Defendant:   See Attached Service List

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 802 _____, Chicago, Illinois 60602

❑ **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

❑ **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

❑ **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

❑ **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

❑ **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

❑ **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 38398
Name: Synergy Law Group
Atty. for: Plaintiff
Address: 730 W. Randolph St. Suite 600
City/State/Zip: Chicago, IL 60661
Telephone: 312-454-0015

WITNESS, MAR 14 2006

_____
Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____

(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

002010

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| JUNCTION SOLUTIONS, LLC f/k/a JUNCTION MANAGEMENT SOLUTIONS, LLC, a Delaware Limited Liability Company, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MBS DEV, Inc., a Colorado Corporation, JEFFREY ERNEST, MITCH TUCKER, and KENNETH R. PAUL, Individuals, | ) ) ) | **Jury Demanded** |
| | ) | |
| Defendants. | ) | |

## SERVICE LIST

MBS Dev, Inc.
1400 West 122nd Avenue Suite 101
Westminster Co. 80234

Kenneth R. Paul
1400 West 122nd Avenue Suite 101
Westminster Co. 80234

Jeffrey Ernest
1400 West 122nd Avenue Suite 101
Westminster Co. 80234

Mitchell Tucker
1400 West 122nd Avenue Suite 101
Westminster Co. 80234

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the preceding NOTICE OF REMOVAL was served upon the following by facsimile, with confirmation by United States mail, first class postage prepaid, on March 24, 2006:

Bartly J. Loethen
Kristen M. Lehner
Synergy Law Group, LLC
730 W. Randolph Street, 6th Floor
Chicago, Illinois 60661

Tel.: (312) 454-0015
Fax: (312) 454-0261
