# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JUNCTION SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06 C 1632 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| MBS DEV, Inc., JEFFREY ERNEST, | ) | |
| MITCH TUCKER, and KENNETH R. PAUL, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Junction Solutions LLC ("Junction") sued defendants MBS Dev, Inc. ("MBS"), Jeffrey Ernest ("Ernest"), Mitch Tucker ("Tucker"), and Kenneth Paul ("Paul") in Cook County Circuit Court, alleging violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA") (Count II), violation of the parties' Confidentiality Agreement (Count III), breach of the parties' Employment Agreement (Count IV), "tortious interference with a contract" (Count V), and intentional interference with prospective economic advantage (Count VI). Count I of the complaint seeks preliminary and permanent injunctive relief. Counts I, II, and VI are alleged against all defendants; Counts III and IV are alleged only against Ernest, Tucker, and Paul. Count V is alleged only against MBS. The case was removed to this court and defendants filed their answer and counterclaims.

Before the court is defendants' motion for judgment on the pleadings. For the reasons explained below, defendants' motion is denied.

# I. BACKGROUND

## A. Junction and MBS

Junction is a provider of software and information technology consulting services for businesses. Among its software applications is the "Junction Multi-Channel Distribution Software for Microsoft Axapta" ("JMCD Software"), which allows businesses to increase the utility of certain software applications created by Microsoft, such as "Axapta." Defendants Ernest, Tucker, and Paul are former Junction employees who helped develop the JMCD Software. When they were hired, the defendants signed confidentiality and employment agreements under which they pledged, among other things, to protect Junction's trade secrets from disclosure to third parties. After helping to create the JMCD Software, however, they abruptly left Junction to begin working for MBS, a competing business software and consulting company founded by Steve and Laura Guillaume, former employees of Junction.

Junction alleges that the Guillaumes founded MBS while they were still employed by Junction, and that during their employment, Steve Guillaume and the other defendants stole trade secrets from Junction. Specifically, Junction alleges that Steve Guillaume and one or more of the other individual defendants made unauthorized copies of all of Junction's software code, saving copies for themselves or for MBS. After defendants left Junction, Junction discovered that defendants had created "new, undisclosed developments" related to the JMCD software, developments which were required to be disclosed pursuant to Steve Guillaume's employment agreement but were not. Junction alleges that these developments belong to Junction.

## B. Colorado Suit

In November 2004, Junction sued MBS and the Guillaumes in the United States District Court for the District of Colorado. *Junction Management Solutions, LLC v. MBS DEV, Inc.,* No. 04-cv-02288-PSW-MJW (D. Colo. filed Nov. 3, 2004) (the "Colorado suit" or the "first suit"). The complaint alleged violation of the ITSA, breach of certain employment agreements, breach of fiduciary duty, inducing a breach of fiduciary duty, intentional interference with contractual relations, intentional interference with prospective business relations and prospective clients, and violation of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* Junction claimed, *inter alia*, that Steve Guillaume had breached his employment agreement with Junction which contained a confidentiality covenant, an agreement not to solicit Junction employees, and an agreement not to compete with Junction for twelve months following the termination of his employment. *See* Colorado Compl. Junction alleged that MBS (through the actions of the Guillaumes) intentionally interfered with Junction's contracts with Ernest, Tucker and Paul. Junction also complained that Steve Guillaume was refusing to return its trade secrets and confidential material related to Junction's Axapta Code. Junction sought injunctive relief "immediately and permanently enjoining any and all of the defendants from using, selling licensing, distributing, and/or marketing Junction's Axapta Code, along with any and all other Junction confidential and trade secret information, to any other individual or entity, for any use whatsoever." Colorado Compl. ¶ 65. Junction sought this relief based on the allegation that "MBS has used and will continue to use Junction Axapta Code and derivatives thereof to create modified or new versions (similar to [J]unction's with similar functionality and similar look and feel) thereof which it will

3

license to prospective customers of Junction and possibly disclosing and/or selling the Junction code to Microsoft, each of which would have a negative impact on Junction's competitive advantage in the industry and all of which would violate the Guillaume Agreement." Colorado Compl. ¶ 60.

In December 2004, after Junction's motion for a preliminary injunction was denied, the parties reached a settlement agreement (the "Settlement Agreement"). Although Ernest, Tucker, and Paul were not originally named as defendants in the suit, they were parties to the Settlement Agreement and as such reaffirmed the pledges made in their Confidentiality and Employment Agreements not to disclose confidential and proprietary Junction information to third parties. The court dismissed the case with prejudice while retaining jurisdiction for the limited purpose of enforcing the Settlement Agreement. *See Junction Management Solutions, LLC v. MBS DEV, Inc.,* No. 04-cv-02288-PSW-MJW, 2007 WL 184682, at *1 (D. Colo. Jan. 22, 2007) (providing a recitation of the procedural history of Junction's case before the Colorado court).

### C. Illinois Suit

In February of 2006—well after the Settlement Agreement had been executed—Junction learned that MBS had entered into a partnership with Iteration2, a California corporation, and that MBS and Iteration2 were planning to market the "MBS multi-channel distribution software for the Axapta Platform for customers with multi-channel distribution requirements." Compl. ¶ 43. Junction alleges that this is identical to its own JMCD Software and claims that the defendants used Junction's intellectual property and trade secrets to develop MBS's product.

4

On March 14, 2006, Junction filed the instant suit in the Circuit Court of Cook County (the "Illinois suit" or the "second suit"). The defendants later removed the suit to this court and moved for dismissal pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, claiming that the venue provision in the Colorado Settlement Agreement required the present litigation to be brought in the District of Colorado.

At the same time, defendants moved to enforce the Settlement Agreement in the District of Colorado, claiming that Junction violated the Settlement Agreement by filing this action in Illinois rather than in Colorado. Judge Phillip S. Figa heard the motion on May 23, 2006 and denied the motion to enforce the settlement agreement. Judge Figa held that the venue provision in the Colorado Settlement Agreement did not apply to the suit before this court because Junction's suit did not arise under the Colorado Settlement Agreement. *See* Tr. Oral Argument May 23, 2006 at 22:1-24:5 (court did not see "the venue provision [in the Settlement Agreement] foreclosing the Illinois case on the basis of Colorado or the District of Colorado providing exclusive venue, because there is no claim or cause of action arising under [the] agreement."). However, Judge Figa stated he was not resolving the issue whether the Colorado Settlement Agreement provided defendants with a defense to Junction's claims. *See id.* In an order dated June 5, 2006, Judge Figa made clear that the dismissal was without prejudice. *See Junction Management Solutions, LLC v. MBS DEV, Inc.,* No. 04-cv-02288-PSW-MJW, 2007 WL 184682, at *1 (D. Colo. Jan. 22, 2007).

This court then denied defendants' Rule 12(b)(3) motion based on Judge Figa's ruling. *See Junction Solutions, LLC v. MBS DEV, Inc.*, No. 06 C 1632, 2007 WL 114306, *3 (N.D. Ill. Jan. 7, 2007) ("Under the doctrine of collateral estoppel, Judge

Figa's decision bars relitigation of the question whether Junction's current claims arise under the Settlement Agreement.").

Defendants have now moved for judgment on the pleadings. Defendants claim that Junction's complaint is either barred by the Settlement Agreement or by res judicata.

## II. DISCUSSION

A motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is subject to the same standard as a Rule 12(b)(6) motion to dismiss. *Guise v. BWM Mortgage, LLC,* 377 F.3d 795, 798 (7th Cir. 2004). The motion should be granted "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomas v. Guardsmark, Inc.,* 381 F.3d 701, 704 (7th Cir. 2004). This means the court must take the facts alleged in the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *Id.*

Although the court may not look beyond the pleadings, it may take into consideration documents incorporated by reference in the pleadings and it may take judicial notice of matters of public record. *See United States v. Wood*, 925 F.2d 1580, 1581-82 (7th Cir. 1991). Here, because Junction's Colorado complaint and the resulting Settlement Agreement are both referenced in Junction's complaint and because they are also matters of public record, the court has taken them into consideration.

### A. Res Judicata

Defendants argue that Junction's claims are precluded by the doctrine of res judicata because Junction's Colorado suit, which made similar allegations to those made before this court, was dismissed with prejudice.[1] Both parties' arguments on this issue

---

[1] Although the defendants do not specify the type of preclusive effect they are seeking, defendants' argument appears to be focused on claim preclusion.

6

are slim—and wrong. However, because it is important to determine what preclusive effect, if any, Junction's Colorado suit has on the one before this court, the court concludes that Junction's current suit is not entirely barred by the Colorado suit.

The federal law of res judicata applies here because the earlier judgment was rendered by a federal court. *See Ross ex rel. Ross v. Board of Educ. of Tp. High School Dist. 211*, 486 F.3d 279, 283 (7th Cir. 2007). As an initial matter, the term "res judicata" in federal courts is used to describe both claim preclusion and issue preclusion (otherwise known as "collateral estoppel"). *See Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 233 (1998). Under the doctrine of claim preclusion, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *See Ross*, 486 F.3d at 283. Issue preclusion means that an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or different claim. For the sake of convenience, the court will use the term res judicata in this opinion to refer to claim preclusion and the term collateral estoppel to refer to issue preclusion.

The Seventh Circuit has identified three requirements that a party asserting res judicata must satisfy: (1) identity of the claim; (2) identity of parties, which includes those in "privity" with the original parties; and (3) a final judgment on the merits. *Id.* at 283. Once these elements are satisfied, res judicata "bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action." *Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337, 338 (7th Cir. 1995). Because there seems to be no dispute that the parties before this court are the

parties involved in the Colorado suit, the court addresses only the first and third elements of res judicata.

### 1. *Effect of the Settlement Agreement*

It is well settled that a dismissal with prejudice upon stipulation of the parties is treated as a final judgment on the merits for purposes of claim preclusion. *See Lawlor v. Nat'l Screen Service Corp.,* 349 U.S. 322, 327 (1955) (dismissal of a case with prejudice pursuant to settlement agreement bars a later suit on the same cause of action); *Golden v. Barenborg*, 53 F.3d 866, 871 (7th Cir. 1995) (Res judicata barred suit by home purchaser against former owner and owner's employer after stipulation of dismissal was reached in suit by purchaser against relocation company, even though additional claims were asserted in second suit, given that both suits derived from sale of home to purchaser, purchaser had opportunity to raise additional claims in suit against relocation company, and relocation company, employer, and former owner were considered same parties for res judicata purposes.).

Judge Figa dismissed Junction's first case with prejudice, granting the parties' joint motion to dismiss pursuant to a settlement agreement. There is no dispute that there was a final judgment in the first case and that the judgment was with prejudice. However, it is also undisputed that no findings of fact or law were made in connection with the settlement. Therefore, although the Colorado suit may provide a basis for res judicata, it cannot provide a basis for collateral estoppel, which requires that an issue of fact or law actually be litigated and resolved by a valid final judgment in order to have a preclusive effect. *See, e.g., Lawlor*, 349 U.S. at 327 (judgment dismissing prior suit "with prejudice" that was unaccompanied by findings was res judicata of the same cause

of action but did not constitute issue preclusion); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir. 1990) (settlement agreements, while settling the issue definitively between the parties, normally do not support an invocation of collateral estoppel).

### 2. *Identity of the Claim*

The next question the court must address is the most crucial one—whether both of Junction's suits involve the same claim, which requires a determination of whether both suits arise out of the same transaction. *See Ross*, 486 F.3d at 283. Under this test, the court evaluates whether the cause of action in both suits derives from "a single core of operative facts." *Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 (7th Cir. 1986). If the two cases arise out of the same transaction, "whether or not they were actually raised in the earlier lawsuit, they may not be asserted in the second or subsequent proceeding." *Ross*, 486 F.3d at 283. "[T]he function of res judicata is to require the joinder of all legal challenges to a wrong, and all claims for relief arising out of those events, without compelling the joinder of claims arising from separate wrongs." *Id.*

On the other hand, traditional principles of preclusion allow additional litigation if some "new wrong" occurs. *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1326 (7th Cir. 1992).

Such standards prove unhelpful when, as is the case here, there is a continuing wrong based on some overlapping facts and some new facts. That is, both of Junction's lawsuits arise out of defendants' alleged misappropriation of Junction's trade secrets in its "multi-channel retail" software while defendants were employed by Junction in 2004. Therefore, at first glance, both suits seem to arise out of the same "core" facts as did the

9

Colorado suit. However, Junction alleges that the activities of defendants that are complained of in Junction's current suit—namely the use and disclosure of those trade secrets—occurred after the time of the settlement agreement. Compl. ¶ 41. Junction's position is that the acquisition of a trade secret is a distinct wrong from the use or disclosure of that trade secret, even if both acts constitute "misappropriation."

In *Lawlor*, the Supreme Court held that the settlement of a previous antitrust action did not bar the plaintiff from bringing a later suit against the same defendants challenging alleged antitrust violations that were based on similar facts to those that had been alleged in the prior suit but that continued after the prior suit's dismissal. The Court stated:

> That both suits involved "essentially the same course of wrongful conduct" is not decisive. Such a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action. And so it is here. The conduct presently complained of was all subsequent to the 1943 judgment. . . . While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.

*Lawlor*, 349 U.S. at 328. The Court stated also that it did not matter whether the defendants' conduct could be regarded as a series of individual torts or as one continuing tort; nor did it matter that the plaintiffs could have pressed for injunctive relief, which if granted, would have prevented the illegal acts being complained of in the second suit. *See id.* at 328-29. In other words, regardless of how the second cause of action is framed, the question is whether the facts upon which the second suit is based were available to the plaintiff at the time of the first suit.

Here, Junction alleges that defendants developed multi-channel distribution software for the Axapta Platform, which they could not have done without using and

disclosing Junction information, and that this development occurred after the Settlement Agreement was entered into. Compl. ¶¶ 43, 45. The court is obligated to rely on Junction's allegations at this stage in the litigation. To prevail in the current suit, Junction will need to prove, *inter alia*, that defendants' software was developed using Junction's trade secrets. According to Junction, this software did not exist until after the Settlement Agreement so Junction could not have incorporated it into its first suit. Whereas the first suit would have required evidence demonstrating that defendants misappropriated Junction's trade secrets in the sense that they "acquired" them, this suit will require evidence that defendants misappropriated those trade secrets by using or disclosing them inappropriately. Therefore, defendants' continuing misappropriation is analogous to the "abatable nuisance" described in *Lawlor*, which may give rise to more than a single cause of action. Further, although Junction could have sought injunctive relief in its first suit which might have prevented the acts being complained of in this current suit, *Lawlor* makes it clear that Junction was not compelled to address defendants' future behavior at the time of its first suit. *See also Intermedics, Inc. v. Ventritex, Inc.*, 804 F.Supp. 35, 42 (N.D. Cal. 1992) (rejecting the argument that continuing or repeated misappropriations of an alleged trade secret can give rise to only a single cause of action for purposes of res judicata because of how substantive trade secret law defines the right or interest). Therefore, although there is factual overlap between the two suits, this suit is not barred by Junction's earlier suit because the two suits do not appear to involve the same claims. This holding is based on Junction's repeated assertions that the facts giving rise to this new claim all arose after the Settlement Agreement.

There can be no question that Junction is precluded from bringing any claims that arose prior to the Settlement Agreement. This is notwithstanding the fact that because the previous court's judgment was entered without findings, the parties will have to present evidence and facts that may overlap with facts central to the claims that were brought in Junction's first suit. *See, e.g., Ross*, 486 F.3d at 283 ("if the supposedly wrongful events are separated by time and function, multiple suits are permissible (even though not desirable)").

### B. Settlement Agreement

Defendants also argue that Junction's suit is barred by the release provision of the Settlement Agreement. The release provision provides in relevant part:

> 5. *Release.* (a) For good and valuable consideration . . . the parties . . . hereby fully and finally release, acquit and forever waive and discharge each other . . . from any and all Claims (as herein defined) which each or any of the parties now have, may now have, or which may exist or claim to exist or relate to or arise from matters occurring at any time in the past until and including the Effective Date against each other, or any of them, including but not limited to any Claims which relate to or arise out of any of the Lawsuit . . . the Employment Agreements . . . and the Confidentiality Agreements . . . . The parties acknowledge that they intend to release all such Claims as set forth in this Section 5(a) through the Effective Date and that the consideration stated herein is sufficient therefor.
>
> (b) Notwithstanding any other provision of this Agreement to the contrary, Section 5(a) hereof shall not apply to any and all Claims arising out of or relating to: (i) the enforcement of the express terms of this Agreement and the agreements and provisions referenced herein which survive the Effective Date, and (ii) any other matter arising after the Effective Date.
>
> (c) "Claims" shall mean . . . any and all actions, proceedings, claims, counterclaims, demands, liabilities, damages, causes of action, costs, expenses, sums of money, obligations, . . . controversies of every kind and description . . . whether known or unknown, accrued or unaccrued, matured or unmatured . . . .

Settlement Agreement ¶¶ 5(a), 5(b). The Settlement Agreement defines December 8, 2004 as the effective date. Junction counters that the Settlement Agreement does not apply because the facts upon which its current suit is based—namely, defendants' alleged disclosure and use of those trade secrets to develop their own software—did not arise until after the effective date. Further, Junction argues, Section 5(b) of the Settlement Agreement, which states that the Release Provision shall not apply to claims arising after the Effective Date of the Agreement, was drafted to preserve Junction's right to bring future claims.

A settlement agreement is a contract whose construction is governed by principles of local contract law. *See Air Line Stewards and Stewardesses Assoc., Local 550, TWU, AFL-CIO v. Trans World Airlines, Inc.*, 713 F.2d 319, 322 (7th Cir. 1983). The parties here have agreed that the Settlement Agreement is subject to Illinois contract law. *See* Settlement Agreement ¶ 13. Illinois courts follow the objective theory of intent, which means "the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement." *Laserage Technology Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (quoting *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.*, 522 N.E.2d 758, 764 (Ill. App. Ct. 1988)). If the contract is unambiguous—which means it is subject to only one reasonable interpretation—"the parties' intent must be derived by the writing itself as a matter of law." *A.W. Wendell & Sons, Inc. v. Qazi*, 626 N.E.2d 280, 292 (Ill. App. Ct. 1993). However, in interpreting a settlement agreement, the court "must give effect to each and every section of the Agreement, and must read the different sections

harmoniously, and accord each section its proper weight, and not read the sections out of context to achieve a desired result." *Air Line Stewards*, 713 F.2d at 322.

Junction's current lawsuit is clearly "related to" matters which occurred prior to the Settlement Agreement. That is, Junction is suing defendants for inappropriately using and/or disclosing its trade secrets—the very same trade secrets that were at issue in Junction's first suit. Indeed, Junction contemplated the risk that defendants might use its trade secrets in the future at the time of its first suit. *See, e.g.,* Colorado Compl. ¶ 60; 65. Were this to be the only relevant provision of the Settlement Agreement, the court's inquiry would be over as the Settlement Agreement would bar Junction's current suit. However, a review of the remainder of the Agreement muddies the water; it is not clear that Junction intended to release claims arising from defendants' *future use* of the trade secrets at issue. For example, Paragraphs 6 and 7 of the Settlement Agreement require defendants to return all of Junction's confidential information relating to the trade secrets at issue, renounce ownership of any of the work they did for Junction, reaffirm their confidentiality obligations under their employment agreements with Junction, and agree that the "Junction Developments and Axapta Developments . . . are the property of [Junction]."

Defendants insist that Junction is alleging one continuous claim rather than a new claim because a claim for misappropriation of a trade secret can arise only once, when the confidential relationship between the parties is initially breached. However, the logical extension of this argument is that Junction agreed to grant defendants complete immunity from all claims relating to their use of Junction's trade secrets, a proposition that is contradicted by the aforementioned provisions. *See* Settlement Agreement ¶¶ 6(a); 6(b);

7 (defendants' confidentiality obligations survive the termination of their employment with Junction and the execution and delivery of the Settlement Agreement). If Junction intended to release defendants from any claim arising out of defendants' future use of Junction's trade secrets, why would defendants have had to agree that those trade secrets are the property of Junction and reaffirm their confidentiality agreements with Junction beyond the Settlement Agreement? It may well be that this is indeed the understanding reached by the parties in negotiating the Settlement Agreement but this understanding is by no means made clear in the Agreement itself.[2]

Defendants are correct that the Settlement Agreement releases parties from claims arising before the Effective Date of the Agreement but they do not provide enough support for the proposition that the Agreement released them from all liability relating to their future usage of the trade secrets at issue. Accordingly, defendants' motion for judgment on the pleadings based on the Settlement Agreement is denied. *See Thomas*, 381 F.3d at 704 (A motion for judgment on the pleadings should be granted "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.").

---

[2] Defendants' citation to *Cadence Systems, Inc. v. Avant! Corp.*, 57 P.3d 647, 651 (Cal. 2002), and *Security People, Inc. v. Medeco Security Locks, Inc.* 59 F. Supp. 2d 1040, 1042-44 (N.D. Cal. 1999), for the proposition that a claim for misappropriation of a trade secret arises only once, at the time of the initial misappropriation, is unavailing because the settlement agreements at issue there were broader than the Settlement Agreement here, which clearly preserved *some* future claims.

### III. CONCLUSION

For the reasons stated above, defendants' motion for judgment on the pleadings is denied.

ENTER:

                                      ___/s/_____
                                      JOAN B. GOTTSCHALL
                                      United States District Judge

Dated: November 21, 2007